[Civ. No. 18956. Fourth Dist., Div. One. Feb. 4, 1980.]

ROYAL PACKING COMPANY, Petitioner, v.
AGRICULTURAL LABOR RELATIONS BOARD, Respondent;
UNITED FARM WORKERS OF AMERICA, AFL-CIO,
Real Party in Interest.

COUNSEL

Dressler, Stoll, Hersh & Quesenbery and Marion I. Quesenbery for Petitioner.

Dennis M. Sullivan and Manuel M. Medeiros for Respondent.

Marco E. Lopez, Carlos M. Alcala, Francis E. Fernandez, Carmen C. Flores, Jerome Cohen, William H. Carder, Ellen Greenstone, Tom Dalzell and Sanford N. Nathan for Real Party in Interest.

OPINION

**BROWN (Gerald), P. J.**—Royal Packing Company (Royal), an agricultural employer subject to the provisions of the Agricultural Labor Relations Act (Act) (Lab. Code, § 1140 et seq.), seeks review of an order of the Agricultural Labor Relations Board (Board) finding Royal has committed unfair labor practices under the Act and decreeing remedies for those practices.

Royal is an Arizona corporation with principal California office in Salinas. It employs about 240 persons to grow, pack and ship lettuce. Its principal shareholders and officers are Jack and Don Hart, brothers. It principally markets "naked pack" lettuce, that is, unwrapped heads of lettuce packed into cartons for sale in the field. However, during the events in question, it also operated two lettuce wrap machines under the respective supervision of foreman Manuel Alcantar (Alcantar) and

Tony Ayala (Ayala). Each machine is operated by a crew of wrappers who stand at specified stations and with mechanical assistance wrap the heads of lettuce for packing as they are cut.

The United Farm Workers of America, AFL-CIO (UFW) brought unfair labor practice charges following the multiunion organizational campaign among Royal employees during the Imperial County winter lettuce season, December 1976 through February 1977. Royal was then a party to a pre-Act collective bargaining agreement with the Western Conference of Teamsters (Teamsters) covering the period July 16, 1975, through July 15, 1978. After the effective date of the Act, UFW filed a petition for certification at Royal on September 5, 1975, in which the Teamsters intervened. Thus began a period of struggle among at least five separate labor organizations to be certified as the bargaining representative of Royal employees, during which period the Board set aside several union elections. The competing unions included the Teamsters, UFW, an employee group which called itself "Trabajadores de la Royal Packing Company," another group called the "Independent Union of Agricultural Workers" (IUAW) formed by two former Teamster organizers (Cano and Gonzales), and a worker group called "Agrupacion de Trabajadores Independientes and Royal Packing Company" (Agrupacion). This period of intense union competition at Royal, interrupted only by the Board's closing its doors due to lack of funding from February to December 1976, culminated for our purposes with an election held March 3, 1977, won by Agrupacion, which the Board order here sets aside on a number of grounds, including preferential access rights granted the Teamsters by Royal.

We review the final Board order by authority of Labor Code section 1160.8, according to the standard of whether it is supported by substantial evidence on the whole record. (*Tex-Cal Land Management, Inc.* v. *Agricultural Labor Relations Bd.* (1979) 24 Cal.3d 335 [156 Cal.Rptr. 1, 595 P.2d 579]; *Universal Camera Corp.* v. *Labor Bd.* (1951) 340 U.S. 474, 491 [95 L.Ed. 456, 469, 71 S.Ct. 456].) On review Royal raises the following issues:

1. The Board found Royal discharged employee Manuel Camacho because of his protected activity in asserting the union rights of fellow employees, but Royal contends Camacho was discharged for use of profanity and insubordination. Royal seeks to annul the portion of the

Board order decreeing Camacho's reinstatement with back pay, and to strike the references to Camacho's discharge from the list of unfair labor practices to be included in the retraction notice which Royal must post, read and mail under the Board order. (Notice.)

2. Royal claims substantial evidence does not support the following findings of unfair labor practices and asks us to delete references to these incidents from the Notice: (a) Royal supervisor Manuel Alcantar created an impression of surveillance of Royal employees' protected union activity by reading aloud a list of supposed UFW supporters under coercive circumstances; (b) Royal gave the Teamster organizers preferential access to its employees by permitting them to solicit signatures on the lettuce wrap machines during work hours while restricting UFW organizers to regulation access, outside working hours; (c) Royal's inauguration of a new and improved employee medical benefits plan in February 1977 was an impermissible attempt to influence the election.

3. Royal claims Board abuse of discretion in requiring posting of the Notice for a 12-month period. The Board here states the 12-month requirement is a typographical error and should read 2 months, and asks us to modify the order accordingly.

We have concluded the finding Camacho's discharge was an unfair labor practice is not supported by any evidence linking his protected union activity to his discharge, hence that finding must be annulled. (*Waterbury Community Antenna, Inc.* v. *N.L.R.B.* (2d Cir. 1978) 587 F.2d 90, 98-99.) There is substantial evidence to support the other challenged Board findings. The duration of the posting period will be modified as the Board requests. The remainder of the Board order, including the setting aside of the election, is not here challenged and is entitled to enforcement.

## I. *Discharge of Camacho*

Manuel Camacho worked for Royal from May 1976 until the day of his discharge on November 11, 1976. He was a member of the thinning crew of Esteban Duran, a volatile supervisor given to sporadic outbursts of temper sometimes resulting in his writing out masses of warning notices on many or most of his crew members, which notices did not

produce any punishment or discharge. Camacho, according to his own admissions as well as the testimony of other witnesses, was also a volatile person who frequently expressed anger in bursts of shouting or profanity. Teamster organizer Martha Cano appointed Camacho Teamster shop steward of the Duran crew because she believed the crew members needed a strongly vocal, fearless representative to counteract Duran's erratic and sometimes oppressive behavior. The evidence shows a number of incidents where Duran and Camacho exchanged angry words. For example, on one occasion Camacho went to the Teamster office against Duran's wishes, to speak for the crew members about a pay raise that had not been paid on time, and Duran followed him there and told the union official not to pay attention to Camacho, who was "crazy." On another occasion, Camacho apparently spoke up on behalf of a 16-year-old boy who had been forced to sit idle in the bus for half a day without working, in violation of what Camacho believed were the boy's rights. Dave Hart, son of Don Hart, testified to a history of clashes between Duran and Camacho, and regardless of the lack of formal warning notices produced at trial, the Board does not seriously dispute the existence of these difficulties between supervisor Duran and shop steward Camacho. The clearest evidence of the conflict is Camacho's frank admissions on the stand he, on occasion, disagreed with Duran's instructions about such matters as how to thin the lettuce, and refused on those occasions to follow Duran's instructions. When asked if he sometimes yelled at Duran he responded, "Yes, just the way that I speak." He resented Duran's telling him or other employees how to do their work, and admits intervening on behalf of another employee saying, "He's doing the work well. Leave him alone." On another occasion he told workers on the bus "to ignore whatever Esteban Duran told him." The testimony of Camacho, of Duran, of Dave Hart and of members of the Duran crew all indicates, regardless of whether Duran or Camacho had the better judgment, Camacho was often loud, angry and disobedient, tending to undermine Duran's authority with his crew and precipitate disruptive confrontations. The day of Camacho's discharge such a confrontation took place. Apparently a dispute developed between Duran, on the one side, and some members of the Jacobo family in the crew, on the other. Duran may have criticized the work of a young boy in the family. Dave Hart testified he observed, from a distance, the young Jacobo boy brandishing a hoe at Duran and Camacho nearby egging on the boy with his gestures. Hart was not close enough to hear what was said, nor does he understand much Spanish, but he thought the scene appeared to be a violent confrontation which endangered Duran's life. He intervened, called off work for the day, and sent

the crew members on to the bus ahead of Hart and Duran. When Hart reached the bus he observed the taillights were smashed. He thought it necessary to follow the bus all the way to the Royal pickup point in Calexico in order to protect Duran. It is not clear whether Duran or Hart made the decision to discharge Camacho, but Hart did do so that day.

■ The Board found Camacho was discharged because he was a union supporter. The hearing officer, however, found Camacho was fired not because he was a union activist, but because he was insubordinate and offensive. Specifically, the hearing officer stated, "I am persuaded that an irreparable personality conflict between Duran and Camacho made Camacho's ultimate discharge or voluntary termination inevitable." Undisputed evidence amply supports this finding. Camacho was a Teamster shop steward. Royal favored the Teamsters. Camacho was not associated with the disfavored union, the UFW (charging party). Camacho's incompatibility with Duran is the obvious reason for his discharge, making irrelevant both his union activity and also the quality of his work for Royal, which the Board now argues in his favor. Board member McCarthy, dissenting from the Board decision on the Camacho issue, correctly notes union activity does not insulate an employee from discipline for insubordination. ■ In the absence of other circumstances, the employer has the right to discharge its employees (*N.L.R.B.* v. *Audio Industries, Inc.* (7th Cir. 1963) 313 F.2d 858, 861) and the mere fact an employee is or was participating in union activities does not insulate him from discharge for misconduct or give him immunity from ordinary employment decisions. (*Waterbury Community Antenna, Inc.* v. *N.L.R.B., supra*, 587 F.2d 90, 97.) The reasoning of *Waterbury* is most instructive: "[W]here the employer was motivated by both valid and invalid reasons, a rule of causation is indispensable. A simple example will illustrate why this is so. If an employer discharges a union organizer in part because of organizational activities and in part because of repeated acts of industrial sabotage, it would be absurd to hold the discharge of that employee to be unlawful. The rule of causation applied in this Circuit is that 'the General Counsel must at least provide a reasonable basis for inferring that the permissible ground alone would not have led to the discharge, so that it was partially motivated by an impermissible one.' [Citations.] The magnitude of the impermissible ground is immaterial [citations] as long as it was the 'but for' cause of the discharge, [citations].

"As the Supreme Court has explained in considering a discharge motivated in part by the exercise of First Amendment freedoms:

"'A rule of causation which focuses solely on whether protected conduct played a part, "substantial" or otherwise, in a decision not to rehire, could place an employee in a better position as a result of the exercise of constitutionally protected conduct than he would have occupied had he done nothing. The difficulty with [such a rule] is that it would require reinstatement in cases where a dramatic and perhaps abrasive incident is inevitably on the minds of those responsible for the decision to rehire, and does indeed play a part in that decision—even if the same decision would have been reached had the incident not occurred. The constitutional principle at stake is sufficiently vindicated if such an employee is placed in no worse a position than if he had not engaged in the conduct. A borderline or marginal candidate should not have the employment question resolved against him because of constitutionally protected conduct. But that same candidate ought not to be able, by engaging in such conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision.' (*Mt. Healthy City Board of Education* v. *Doyle*, 429 U.S. 274, 285-86, 97 S.Ct. 568, 575, 50 L.Ed.2d 471 (1977)." (587 F.2d 90, 98-99.)

 Both sides submitted competent evidence of Camacho's work record, his deeds, his words, his vigorous union proclivities, as well as the activities of the employer's agents. There is no substantial conflict concerning certain of Camacho's words and deeds that point unerringly to the conclusion Camacho, on a number of occasions, used profane language to his superiors, disobeyed work orders, sought to undermine his superiors' authority, was angry, offensive and insubordinate. These facts, many admitted, authorize Camacho's discharge.

The record is also replete with evidence of Camacho's vigorous union activities from which a suspicion of employer's animus, a desire to get rid of a troublemaker, emanates. What is lacking, however, is substantial evidence from which the Board could draw the inference of a causal nexus—that Camacho would not have been discharged "but for" his union activities or that his union activities were a "moving" or "substantial" cause of his discharge. (See *Polynesian Cultural Ctr. Inc.* v. *N.L.R.B.* (9th Cir. 1978) 582 F.2d 467, 473.)

As we have pointed out, Camacho was a member of the union Royal favored. The timing of the discharge, following immediately upon what the employer perceived to be activities encouraging an assault on

Duran, offers no evidentiary support whatsoever for an inference Camacho's union activities were a substantial motivating force behind his discharge. The circumstances, including the timing of the discharge, instead support contrary inferences. Duran approved of Camacho's shop steward status. Thus what is lacking is substantial evidence of a nexus —a causal relationship between Camacho's union activity and his discharge. In sum, the issue before us is not whether Camacho was a strong union activist, but rather, is whether there is substantial evidence in the record considered as a whole to support the Board's conclusion Camacho would not have been discharged but for his union activities. There is none. "Mere suspicion" is not sufficient to sustain the Board's finding Camacho's discharge was motivated by employer animus arising from his "protected" activities. (*N.L.R.B.* v. *Eastern Smelting & Refining Corp.* (1st Cir. 1979) 598 F.2d 666, 670.)

■ We agree with the Board's analysis of the general rules of review governing cases such as this, where the Board has disagreed with factual findings by its hearing officer. These rules briefly stated are, the substantial evidence standard of review does not change simply because the Board has disagreed with the administrative law officer. (*Penasquitos Village, Inc.* v. *N.L.R.B.* (9th Cir. 1977) 565 F.2d 1074, 1083.) The appellate court must still start with the fact finding made by the Board and accept it if it is supported by substantial evidence. (*N.L.R.B.* v. *Miller Redwood Company* (9th Cir. 1969) 407 F.2d 1366, 1369.)

In *N.L.R.B.* v. *Miller Redwood, supra,* at page 1369, the court stated: "The Board found Davis was discharged because of his unionism. The fact that the Board disagreed with the Examiner's ultimate conclusion as to Davis does not detract from the substantiality of the support for the Board's result. The Examiner's resolution of conflicting testimony was not disturbed. The disagreement related solely to the inferences to be drawn from the whole record and the proper application of the statute. In such a case, 'the presumptively broader gauge and experience of members of the Board have a meaningful role.' [Citations.]"

■ On the whole record before us, there was no lack of substantial evidence bearing upon the company's motive in firing Camacho. In such factual circumstance, it was the province of the Board to decide on conflicting evidence, the employer's motivation. (*United States Rubber Company* v. *N.L.R.B.* (5th Cir. 1967) 384 F.2d 660, 663; *N.L.R.B.* v. *Ayer Lar Sanitarium* (9th Cir. 1970) 436 F.2d 45, 49.) And where, as

here, the employer's motive is the central issue, the fact finder must often rely heavily on circumstantial evidence and inferences. Only rarely will there be probative direct evidence of the employer's motivation. (*Shattuck-Denn Mining Corp., (Iron King Branch)* v. *N.L.R.B.* (9th Cir. 1966) 362 F.2d 466.) It is a well-established rule that in such cases the Board is free to draw inferences from all the circumstances, and need not accept self-serving declarations of intent, even if they are uncontradicted. (*N.L.R.B.* v. *Pacific Grinding Wheel Co., Inc.* (9th Cir. 1978) 572 F.2d 1343; *Shattuck-Denn Mining Corp., (Iron King Branch)* v. *N.L.R.B., supra,* 362 F.2d 466; *N.L.R.B.* v. *Warren L. Rose Castings, Inc.* (9th Cir. 1978) 587 F.2d 1005, 1008.)

The rule accurately stated is: "Even were the employer's evidence uncontradicted as to his motive behind any certain action, the Board may, but need not, accept it; nor is it bound thereby. *National Labor Relations Board* v. *Walton Mfg. Co.,* 369 U.S. 404, 82 S.Ct. 853. . . ." (*N.L.R.B.* v. *Mrak Coal Company* (9th Cir. 1963) 322 F.2d 311, 313.)

Thus, the Board is free to draw its own inferences from the evidence available to it. If the Board can point to evidence which supports its inference, courts have allowed the Board's finding to stand despite the fact the administrative law judge interpreted the facts contrary to the inference drawn. (*N.L.R.B.* v. *Long Island Airport Limousine Serv. Corp.* (2d Cir. 1972) 468 F.2d 292; *Oil, Chemical and Atomic Wkrs. Int. U., Local 4-243* v. *N.L.R.B.* (1966) 362 F.2d 943 [124 App.D.C. 113].) As the United States Supreme Court pointed out in *Universal Camera Corp.* v. *Labor Bd., supra,* 340 U.S. 474, 496 [95 L.Ed. 456, 472]: "The significance of [the ALO's] report, of course, depends largely on the importance of credibility in the particular case."

The Board here has not disturbed any hearing officer's credibility findings relative to the events leading up to Camacho's discharge. There are no articulated credibility evaluations—demeanor based or otherwise—to be found in the hearing officer's determination of the Camacho charge. Therefore, the rules applicable in such circumstances as expressed in *Penasquitos Village, Inc.* v. *N.L.R.B. supra,* 565 F.2d 1074, have no application here. Here there exists substantial evidence of multiple motives for discharge. Such conclusion, however, does not end the matter. As we have stated, what is lacking is evidence of causal nexus between the possible antiunion motive and the discharge. That lack is the reason why the Board finding of unlawful discharge cannot stand.

■ The burden is on the charging party to prove the motive for Camacho's discharge was punishment for engaging in protected union activity. (E.g., *Florida Steel Corp.* v. *N.L.R.B.* (5th Cir. 1979) 587 F.2d 735, 744-745; *Interlake Iron Corp.* v. *National Labor Relations Board* (7th Cir. 1942) 131 F.2d 129, 133-134; *Schwob Manufacturing Company* v. *N.L.R.B.* (5th Cir. 1962) 297 F.2d 864, 870.) That burden was not met here. Accordingly we annul that portion of the Board order decreeing reinstatement of Camacho and awarding him back wages, and order the statement of the Camacho incident to be deleted from the notice which Royal must promulgate.

## II. *Finding of Improper Surveillance*

■ The hearing officer found, and the Board agreed, Royal gave the impression of surveillance and thereby interfered with its employees' exercise of protected union activity under Labor Code section 1152 when Alcantar read aloud to his crew the names of UFW supporters listed in the notebook of a UFW organizer. A crew member found the notebook in a portable toilet and Alcantar seized it and said words to this effect: "Aha! Now I know who the Chavistas are." The Board opinion states, "such conduct further contributed to an atmosphere which tended to make free choice by employees impossible." This finding forms part of the basis for setting aside the latest election, a result unchallenged here by Royal, and also results in inclusion of the following phrase in the notice: "We will not give the impression of spying on employees' union activity by reading aloud, or otherwise making public, the names of members and supporters of the UFW or any other labor union."

Royal argues the list reading incident had a minimal effect in context, but we point out the effect of the remedial order is likewise de minimus in that it merely compels Royal to promise to refrain from acts which are illegal. In any case, the evidence of the incident conflicts as to whether Alcantar read the list aloud, whether he did so in a joking or coercive manner, and whether the crew members whose names were on the list reacted with indifference, humor, or fear. Under those circumstances we defer to the findings of the hearing officer and the Board as to the impact of the incident. (*Universal Camera Corp.* v. *Labor Bd., supra*, 340 U.S. 474, 488 [95 L.Ed. 456, 467]; *Tex-Cal Land Management, Inc.* v. *Agricultural Labor Relations Bd., supra*, 24 Cal.3d 335, 346; see also *Topanga Assn. for a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506, 514 [113 Cal.Rptr. 836,

522 P.2d 12]; *Interlake, Inc.* v. *N.L.R.B.* (8th Cir. 1976) 529 F.2d 1277.) We further note the hearing officer here appears to have acted judiciously and impartially, weighing the testimony of all witnesses and not mechanically choosing to believe all the witnesses for one side while discounting those on the other. (Cf. *Sunnyside Nurseries, Inc.* v. *Agricultural Labor Relations Bd.* (1979) 93 Cal.App.3d 922, 931 [156 Cal.Rptr. 152].)

### III. *Preferential Access to Teamsters*

■ Royal here reiterates its claim of de minimus in opposing the finding of the hearing officer and the Board of preferential Teamster access during the period of union campaigning. There was some, admittedly slight evidence, consisting of the testimony of former Teamster organizers Martha Cano and Oscar Gonzales, that on one occasion during working hours Cano was permitted to replace a worker on the Alcantar wrap machine, and later a worker on the Ayala machine, in order to free the wrapper to solicit signatures for the Teamsters. Cano and Gonzales also testified the UFW organizers would not have been permitted worktime access, a fact corroborated by testimony of Royal workers also. Again, the finding of an unfair labor practice here affects only the content of the cease and desist order and notice, and results only in ordering Royal to refrain from that which is illegal. This part of the order is therefore insignificant, and we are not disposed to reverse the findings of the hearing officer and the Board, resting on credibility resolutions and assessment of the context of the alleged violations. Royal notes under the collective bargaining agreement then in force, Teamster organizers, unlike those from competing unions, had the right to come on Royal premises during working hours to assist with employee grievances and otherwise carry on union business. That right, however, did not extend to solicitation of signatures, and the question whether Cano and Gonzales were soliciting signatures or simply carrying on legitimate union business is one of fact. Accepting as we must the hearing officer's finding the Teamsters were permitted to solicit for their union on work time while UFW organizers were not so permitted, it follows such preferential access is an unfair labor practice tending to influence the employees' choice of a union unfairly and is impermissible. (Lab. Code, § 1153, subds. (a) and (b); *Labor Board* v. *Waterman S.S. Co.* (1940) 309 U.S. 206, 224-226 [84 L.Ed. 704, 714-715, 60 S.Ct. 493]; *I.A. of M.* v. *Labor Board* (1940) 311 U.S. 72, 78-79 [85 L.Ed. 50, 55, 61 S.Ct. 83].)

IV. *Institution of Improved Medical Benefit Plan*

■ We have already referred to the history of union election activity at Royal between July 15, 1975, and May 3, 1979. There was intense competition between the five unions named above, many election petitions were filed and the Board set aside several elections, the last being the March 1977 election set aside by the order we are now reviewing. Under its original agreement with the Teamsters, Royal contributed to a medical plan for its employees which was due to be replaced by a different Teamster plan when it expired on November 1, 1976. (The replacement agreement was part of a "Resolution of Reopener on Wages" signed by the Teamsters and Royal in September 1976, in modification of the original collective bargaining agreement.) The replacement plan was never instituted. In January 1977, just following the UFW's withdrawal of an election petition it had filed December 31, 1976, Royal and the Teamsters signed a memorandum of understanding releasing Royal from its contractual obligation to contribute to the Teamster plan and leaving Royal free to institute its own plan. At that time the Teamsters were in the process of withdrawing from organizing agricultural labor in California, a fact known to Royal's management. The memorandum of understanding further provided Royal would provide a medical plan effective February 1, 1977. Royal then arranged for a better plan than the one previously in effect. Dental benefits were added and contributions for doctor's office visits and pregnancy expenses were increased. During January preceding introduction of the plan, Royal distributed to its employees Spanish language copies of the plan and copies of a letter from the insuring agent to Jack and Don Hart complimenting them for their "on-going concern toward their employees' happiness and security." When Royal introduced this new plan in January 1977, no election petition was formally pending. The UFW had filed a petition for certification December 31, 1976, which was withdrawn January 4, 1977, and Agrupacion did not file its petition until February 23, 1977. However, during January and February, intense organizational activity continued by the UFW, the IAUW, and later Agrupacion, and Royal engaged in what the hearing officer referred to as a "no union campaign" consisting of a series of discussions between the employees and Don Hart in which Hart stated Royal management's desire to have the workers try a year of no union. Royal also distributed company leaflets at this time informing the work force of the improved medical benefits. Hart specifically told the workers the Teamsters were leaving agriculture, an election would be held in the near future, the workers should vote "no union", and the company promised good bene-

fits including the medical plan. Hart testified he began consideration of a new plan in May 1976, but admittedly Royal took no overt acts to implement such a plan before January 1977, when Hart signed the memorandum of understanding releasing Royal from its Teamster contribution obligation.

Royal argued it instituted the improved plan to remain competitive with other similarly situated employers, and also claimed there was no election pending when the plan was instituted, and it was then probable no union might win a majority of Royal employees for many months, if ever. Accordingly, it claims there is no evidence the plan was introduced to affect a pending election or otherwise to influence employee choice of bargaining representative. Charging party, on the other hand, contends the plan was part of Royal's no union campaign, promising the employees a plan even better than that which they had under the Teamsters. The hearing officer here concluded the evidence preponderated in favor of the latter position, and the plan was an impermissible "well-timed increase in benefits" as described in *Labor Board* v. *Parts Co.* (1964) 375 U.S. 405, 409 [11 L.Ed.2d 435, 439, 84 S.Ct. 457]: "The danger inherent in well-timed increases in benefits is the suggestion of a fist inside the velvet glove. Employees are not likely to miss the inference that the source of benefits now conferred is also the source from which future benefits must flow and which may dry up if it is not obliged."

Regardless whether an election petition is formally pending, benefit increases may violate the N.L.R.A. where they are intended to and do interfere with the workers' organizational rights. (*Labor Board* v. *Parts Co., supra*, 375 U.S. 405, 409 [11 L.Ed.2d 435, 439]; *N.L.R.B.* v. *WKRG-TV, Inc.* (5th Cir. 1973) 470 F.2d 1302; *N.L.R.B.* v. *Furnas Electric Company* (7th Cir. 1972) 463 F.2d 665.) The timing issue is crucial. Here, however, in view of the turbulent labor history at Royal and the multiple unsuccessful elections that had occurred, the timing is not as significant as it might otherwise be, and Royal argues with some persuasive force, if it were precluded from instituting an improved medical plan for its employees until there was zero probability of an election petition being filed, it might have to wait forever. Nevertheless, in the face of voluminous and conflicting evidence regarding the reasons why the plan was instituted and its effect on Royal employees, we cannot say as a matter of law there is no substantial evidence to support the findings of the hearing officer and the Board on this issue. Royal seeks to rely on *N.L.R.B.* v. *Tommy's Spanish Foods, Inc.* (9th Cir.

1972) 463 F.2d 116, but that case is not controlling because there it was clear the benefit plan was instituted before union considerations entered the picture. This case is closer to the situation in *Owens-Corning Fiberglas Corporation* v. *N.L.R.B.* (4th Cir. 1969) 407 F.2d 1357, where there was no doubt another election was imminent when benefits were offered, and one might say of Royal's increased benefits plan, as the court said of another such benefit in *N.L.R.B.* v. *WKRG-TV, Inc., supra,* 470 F.2d 1302, 1308, "Lightning struck only after the union's rod was hoisted." Also, as charging party argued, if Royal did intend as early as May 1976 to institute the improved plan it could easily have done so without any possibility of interference with an election, since the Board's doors were closed to election petitions from February to December 1976. We conclude the evidence supports the agency findings on this issue and the portion of the Board order stating such plan to constitute an unfair labor practice is entitled to enforcement. Such enforcement may have the unfortunate and ironic result of depriving Royal employees of an excellent medical plan. The Supreme Court, however, has noted in *Labor Board* v. *Parts Co., supra,* 375 U.S. 405, 410 [11 L.Ed.2d 435, 439]: "The beneficence of an employer is likely to be ephemeral if prompted by a threat of unionization which is subsequently removed. Insulating the right of collective organization from calculated good will of this sort deprives employees of little that has lasting value."

The order of the Board is annulled insofar as it relates to the discharge of Manuel Camacho. The period during which the notice must be posted is modified from 12 to 2 months. The order of the Board is otherwise affirmed, each party bearing its costs.

Cologne, J., and Staniforth, J., concurred.