[L.A. No. 31310. July 27, 1981.]

MARTORI BROTHERS DISTRIBUTORS, Petitioner, v.
AGRICULTURAL LABOR RELATIONS BOARD, Respondent;
HERIBERTO SILVA et al., Real Parties in Interest.

COUNSEL

Dressler, Stoll, Quesenbery, Laws & Barsamian, Dressler, Stoll, Hersh & Quesenbery, Marion I. Quesenbery, Charley M. Stoll, Laurie A. Laws, Nancy D. Bauer and Robert P. Roy for Petitioner.

Ellen Lake, Manuel M. Medeiros and Daniel G. Stone for Respondent.

Marco E. Lopez, Carlos Alcala, Francis E. Fernandez, Carmen S. Flores, Jerome Cohen, William H. Carder, Ellen S. Greenstone, Sanford N. Nathan and Tom Dalzell for Real Parties in Interest.

OPINION

THE COURT.*—Martori Brothers Distributors, a partnership employing agricultural workers, petitions to review an order of Agricultural

---

*Before Tobriner, Acting C. J., Mosk, J., Richardson, J., Newman, J., Files, J.,† Kaus, J.,† and Cobey, J.†

†Assigned by the Acting Chairperson of the Judicial Council.

Labor Relations Board (board) which found that petitioner had committed an unfair labor practice in terminating Heriberto Silva from employment on January 11, 1978. We will remand the case to the board for further proceedings.

Silva worked for petitioner in Arizona during the 1966-1969 crop seasons. On December 9, 1976, he was hired by petitioner for the 1976-1977 season for lettuce cultivation and harvesting in the Imperial Valley. During these periods Silva with the knowledge of petitioner engaged in extensive activities on behalf of the United Farm Workers of America, AFL-CIO.

1. *1977 Discharge.*

On January 6, 1977, Silva was discharged by Steven Martori, one of the petitioner's partners, following a confrontation which occurred in the field between Edward Martori, Steven Martori's cousin, and Silva during which the latter demanded duties as a stitcher rather than as a cutter. Edward advised Silva that petitioner had sufficient stitchers but Silva insisted that Edward should replace one of them. During this exchange Silva "got completely distraught and was raising his hands yelling and screaming obscenities about Edward and his family" and threatened "to get the Martoris." Edward reported the incident to Steven who advised Silva that a stitcher would not be replaced in the middle of the day, but that Silva could change jobs the next day.

Later during the afternoon of the same day Silva continued his argument, this time with Steven in petitioner's office, telling Steven how petitioner's farm should be run. There were a number of persons in the office and Silva was described as "screaming" and "rambling," causing a "big, blown-up commotion ... he was just going crazy." Although termination of employment had not previously been mentioned, Silva inquired of Steven, "are you trying to tell me I'm fired?" and Steven told him that if he wanted to be fired, he was fired. Silva left the office shouting that he was going to talk to Cesar Chavez and his attorneys, and that they soon would be running the farm and "would get" all the Martoris.

The following morning Silva distributed leaflets and talked to petitioner's workers. Steven told Silva that under the access rule he had no right to be there after work commenced and asked him to leave. After a lengthy discussion Silva left.

Silva thereupon filed a complaint with the board through the United Farm Workers union claiming that his discharge was an unfair labor practice, motivated by his efforts to organize workers. He was rehired the following day pending the outcome of the hearing on his discharge. At the ensuing hearing, Steven testified that the reason for the rehiring was, in accordance with labor law custom, financial, i.e., to mitigate damages—if Silva prevailed the employer would be required to pay for lost hours whether or not actually worked.

After Silva's reemployment, another confrontation occurred. Although he was then working as a stitcher Silva decided he would rather be a cutter. He left his machine repeatedly and went into the field to cut lettuce. A few days later he quit by not appearing for work.

After a hearing in March 1977, before the board on the unfair practice complaint, Silva repeated his threats against Steven and his family. Steven testified that a number of employees complained to him of threats made by Silva. One employee said Silva came to his residence and demanded that the two go behind the home and fight.

The board found that Silva had been insubordinate and that his abusive behavior had goaded his employer into firing him. The board thereupon concluded that Silva's discharge was lawful and was not motivated by union activities. (4 A.L.R.B. 80.)

2. *1978 Discharge.*

Steven testified in the present board proceedings that he had instructed his foremen not to rehire Silva. However, Silva was rehired by one of petitioner's foremen, Juan Martinez, on January 6, 1978.

While there was no substantial dispute as to events occurring in 1977, there is substantial dispute regarding the 1978 discharge. Silva testified that he was working for another company before January 6 but he wanted to return to petitioner because the pay was better. On the morning of January 6, in Calexico, Silva accompanied a friend to the Martori farm to pick up his friend's check, at which time Juan Martinez, a Martori employee, offered Silva a job. Silva began work immediately without notifying his prior employer. Before and after work on his third work day in 1978 Silva circulated a petition among his fellow workers, urging that petitioner be required to enter into a

collective bargaining contract with United Farm Workers. One of the Martori foremen observed him circulating the petition.

Before work on the morning of Silva's fifth employment day of 1978, some Martori employees discussed with him their right to payment for repacking rain-damaged boxes. After a few words, a foreman approached Silva and the employees and stated to them that they would be paid for all the boxes. Steven was some distance away and was unable to hear this discussion.

As the workers dispersed to go to work, Steven recognized Silva and asked him what he was doing there. He responded he had been hired by Juan Martinez and was working for petitioner. Steven replied, "No you're not." Silva asked why. Steven's precise answer is disputed. Silva testified that Steven said he could not keep Silva after the damage done at the 1977 hearings. Steven's version was that he told Silva that he was discharged because of the prior threats against him and his family. After consulting Juan Martinez, Steven told Silva that he was dismissed but could work the rest of the day.

Steven testified that he had not noticed Silva until the day of discharge. Between the periods of the 1977 and 1978 employment, Silva had grown a full beard. Silva insisted that he was working in the fields during the period that Steven observed the workers, and on one occasion while leaving the field with other workers, had passed within four feet of Steven.[1]

At the end of the day Silva was discharged with approximately 10 other workers for lack of work. There is no evidence that the other discharged workers were active in union activities.

One worker testified that he heard Juan Martinez state that Silva had caused many problems, had filed a complaint which would cost petitioner millions of dollars, and because it was necessary to terminate some workers Martinez would take that opportunity to terminate Silva. Martinez testified he had terminated troublemakers first, and that he was told by Steven that Silva was to be fired.[2]

---

[1] During this period petitioner had 3 foremen, each supervising 45 to 50 workers.

[2] Martinez's testimony was vague and confusing as to *his* reason for firing Silva. However, it is undisputed that Silva was fired on Steven's orders.

On the day after the discharge, Silva returned to the field and confronted Steven. He was told twice to leave the field but refused. Steven then physically removed him from the field.

The administrative law officer (ALO) concluded that Silva was unlawfully terminated in 1978 for his union activities, for filing charges and for testimony at board hearings. The ALO moreover found that Silva had made no "personal threats of any kind," and the occasional disturbing remarks were overlooked by the employer in rehiring him. The ALO had observed Silva with and without a beard and concluded that it was incredible that anyone would not recognize Silva with a beard and that if he was really a troublemaker he would have been terminated immediately rather than at the end of the day. The ALO also concluded that the claimed justification for the discharge was a mere pretext and that the employer violated Labor Code section 1153, subdivisions (a), (c) and (d).[3]

The board concluded that the ALO had correctly resolved the claimed justification for the discharge as a pretext. The board further noted that the initial threats did not prompt any discipline and that Silva was reinstated shortly thereafter. It concluded that Steven's condonation of past threats and the statements attributed to Steven and Juan demonstrated that Silva's union activities were the motivating reasons for his discharge.

■ Findings of the board with respect to questions of fact are conclusive if supported by substantial evidence on the record considered as a whole. (Lab. Code, § 1160.8; *Tex-Cal Land Management, Inc.* v. *Agricultural Labor Relations Bd.* (1979) 24 Cal.3d 335, 343-346 [156 Cal.Rptr. 1, 595 P.2d 579].) While the administrative agency under this test is empowered to resolve conflicts in the evidence and to make its own credibility determination, "the test of substantiality must be measured on the basis of the entire record, rather than by simply isolating evidence which supports the board and ignoring other relevant facts of record which rebut or explain that evidence." (*Garza* v. *Workmen's Comp. App. Bd.* (1970) 3 Cal.3d 312, 317 [90 Cal.Rptr. 355, 475 P.2d

---

[3]Labor Code section 1153 provides: "It shall be an unfair labor practice for an agricultural employer to do any of the following: [¶] (a) To interfere with, restrain, or coerce agricultural employees in the exercise of the rights guaranteed in Section 1152.... [¶] (c) By discrimination in regard to the hiring or tenure of employment, or any term or condition of employment, to encourage or discourage membership in any labor organization.... [¶] (d) To discharge or otherwise discriminate against an agricultural employee because he has filed charges or given testimony under this part."

451]; *LeVesque* v. *Workmen's Comp. App. Bd.* (1970) 1 Cal.3d 627, 635 et seq. [83 Cal.Rptr. 208, 463 P.2d 432].; *Royal Packing Co.* v. *Agricultural Labor Relations Bd.* (1980) 101 Cal.App.3d 826, 834-837 [161 Cal.Rptr. 870]; *Sunnyside Nurseries, Inc.* v. *Agricultural Labor Relations Bd.* (1979) 93 Cal.App.3d 922, 930 et seq. [156 Cal.Rptr. 152].)

■ An administrative board must accept as true the intended meaning of uncontradicted and unimpeached evidence. (E.g., *McAllister* v. *Workmen's Comp. App. Bd.* (1968) 69 Cal.2d 408, 413 [71 Cal.Rptr. 697, 445 P.2d 313]; *LeVesque* v. *Workmen's Comp. App. Bd., supra,* 1 Cal.3d 627, 639.) ■ While the interest of a witness may be a factor warranting rejection of uncontradicted evidence in some circumstances (see Witkin, Cal. Evidence (2d ed. 1969) § 1113, pp. 1029-1030), there are other situations in which the interest of a party in obtaining relief will not render all of his testimony subject to disbelief. (*Leonard* v. *Watsonville Community Hosp.* (1956) 47 Cal.2d 509, 518 [305 P.2d 36].) In *Leonard*, it was held that the res ipsa loquitur inference against a defendant was dispelled as a matter of law by a codefendant's testimony harmful to himself but favorable to the defendant, in the absence of any rational basis for disbelieving the testimony.

Similarly, we are satisfied that when a party testifies to favorable facts, and any contradictory evidence is within the ability of the opposing party to produce, a failure to bring forth such evidence will require acceptance of the uncontradicted testimony unless there is some rational basis for disbelieving it.

The Martoris' testimony of the erratic behavior of Silva prior to 1978 is uncontradicted.[4] Silva was present throughout the hearings, and cross-examined the Martoris on behalf of the union. He did not deny the threats to harm the Martoris, their family, and their business and did not dispute the bizarre behavior attributed to him.

■ In the absence of union discrimination, the administrative board lacks any control over an employer's business policies. (*N. L. R. B.* v. *Lowell Sun Publishing Company* (1st Cir. 1963) 320 F.2d 835, 842-843, conc. opn.) ■ The mere fact an employee is or was participating in union activities does not insulate him from discharge for miscon-

---

[4]Silva denied erratic behavior as to two incidents described by Steven. Those two incidents have been omitted from the statement of facts in this opinion.

duct or give him immunity from routine employment decisions. (*Waterbury Community Antenna, Inc.* v. *N. L. R. B.* (2d Cir. 1978) 587 F.2d 90, 97; *Royal Packing Co.* v. *Agricultural Labor Relations Bd., supra*, 101 Cal.App.3d 826, 833.)

■ Where the evidence indicates that an employer was motivated by both an antiunion bias and legitimate business interests in discharging an employee, the so-called "dual motive" situation, the courts have applied at least three different rules. Some cases have held that if antiunion bias played any part in, or partially motivated, the discharge, the employee is entitled to reinstatement even though other legitimate grounds for discharge may exist. (E.g., *N. L. R. B.* v. *Central Press of California* (9th Cir. 1975) 527 F.2d 1156, 1158; *Abatti Farms, Inc.* v. *Agricultural Labor Relations Bd.* (1980) 107 Cal.App.3d 317, 335-336 [165 Cal.Rptr. 887].)

Other authorities have applied a second or "dominant motive" test for the discharge, focusing on a determination of whether union activities or legitimate business reasons were the principal moving forces behind the discharge. (E.g., *Allen* v. *N. L. R. B.* (D.C. Cir. 1977) 561 F.2d 976, 982.)

Finally, a third line of cases has applied a "but for" test. When it appears that an employee was dismissed because of combined valid business reasons as well as for invalid reasons, such as union or other protected activities, the question becomes whether the discharge would not have occurred "but for" the protected activity. (*Royal Packing Co.* v. *Agricultural Labor Relations Bd., supra*, 101 Cal.App.3d 826, 834-835; *Sunnyside Nurseries, Inc.* v. *Agricultural Labor Relations Bd., supra*, 93 Cal.App.3d 922, 935 et seq.)

The "but for" test is substantially the same test as that which is applied when it appears that a public employee was dismissed on the basis both of dissatisfaction with his conduct and his exercise of constitutional rights. (*Mt. Healthy City Board of Ed.* v. *Doyle* (1977) 429 U.S. 274, 283-287 [50 L.Ed.2d 471, 481-484, 97 S.Ct. 568]; *Miller* v. *Chico Unified School Dist.* (1979) 24 Cal.3d 703, 715, 722 [157 Cal.Rptr. 72, 597 P.2d 475]; *Bekiaris* v. *Board of Education* (1972) 6 Cal.3d 575, 592-594 [100 Cal.Rptr. 16, 493 P.2d 480].) As we explained in *Bekiaris*: "Just as we decline to permit school authorities to mask an unconstitutional dismissal behind a statement of valid causes, so we cannot allow a teacher genuinely dismissed for valid causes to be reinstated be-

cause school authorities were also displeased with his exercise of constitutional rights. If it were otherwise a teacher about to be dismissed for valid causes could insulate himself from dismissal simply by engaging in political activities offensive to his superiors." (6 Cal.3d at p. 593, fn. 12.)

We think it significant that very recently the National Labor Relations Board adopted this "but for" test. (*Wright Line, a Division of Wright Line, Inc.* (Aug. 27, 1980) 105 L.R.R.M. 1169, 1171-1173 [251 N.L.R.B. No. 150].) Under *Wright Line*, once the employee has shown that his union activities were a motivating factor in the employer's decision to discharge him, the burden shifts to the employer to show that discharge would have occurred in any event. If the employer fails to carry his burden in this regard, the board is entitled to find that discharge was improper. (105 L.R.R.M. at pp. 1174-1175.)

Labor Code section 1148 provides that "[t]he board shall follow applicable precedents of the National Labor Relations Act, as amended." In light of the recent *Wright Line* decision, the ALRB henceforth should apply this "but for" standard in assessing the dual motive for discharge of agricultural workers under the Agricultural Labor Relations Act. When it is shown that the employee is guilty of misconduct warranting discharge, the discharge should not be deemed an unfair labor practice unless the board determines that the employee would have been retained "but for" his union membership or his performance of other protected activities.

In the present case, there was some evidence to support a finding that Silva's discharge was improper under the "but for" test, including Silva's involvement in a wage dispute with Martori immediately preceding his discharge, Silva's testimony regarding Steven Martori's remarks to him on termination, and supervisor Martinez' opinion regarding the true reason for Silva's discharge. On the other hand, there was ample evidence to sustain Martori's action, including evidence that Silva was insubordinate, made threats against Steven Martori, his family, and his business, and engaged in outrageous and disruptive conduct which would warrant his discharge. Rejecting the foregoing justification for the discharge, however, the board concluded that these matters were mere pretext, and that the true reason for Silva's discharge was because of his union activities. The National Labor Relations Board has pointed out that "pretext" is merely another way of stating that there was no sufficient business justification. (*Wright Line, a Division of Wright*

*Line, Inc., supra*, 105 L.L.R.M. 1169, 1170 and fns. 4, 5.) Steven Martori was present during most of the misconduct of Silva in 1977, and participated in the hearings relating to the first discharge, which the board concluded was not motivated by union bias. One might reasonably doubt that he was unaware of Silva's misconduct or that he failed to consider it at the time of the second discharge in 1978.

The board also deemed it significant that Silva was not terminated immediately after first making threats in 1977, and was in fact reinstated shortly after making major threats. However, he was discharged on the same day that he first made the threats and, although Silva was reinstated the next day, petitioner continued to litigate the validity of the first discharge and merely sought to mitigate damages.[5]

■ Condonation is properly invoked only when there is clear and convincing evidence that the employer has forgiven the employee, intending to wipe the slate clean. (*N.L.R.B.* v. *Colonial Press, Inc.* (8th Cir. 1975) 509 F.2d 850, 854-855.) In the present case petitioner vigorously contested the earlier claim of unfair labor practice. In addition, the testimonies of both Steven and Silva as to the opening comments at their meeting on the morning of the second discharge in 1978 reflect Steven's surprise at finding Silva on the premises.

As the board may have been unaware of the correct legal standard for measuring the propriety of a discharge based in part on the employer's antiunion bias, and as the board may have misapplied the evidence relevant to such a determination, the case should be returned to the board so that it may reconsider its decision. (*J. R. Norton Co.* v. *Agricultural Labor Relations Bd.* (1979) 26 Cal.3d 1, 38-40 [160 Cal.Rptr. 710, 603 P.2d 1306].)

Let a decree issue setting aside the board's order and remanding the cause for further proceedings consistent with this opinion.

NEWMAN, J.—I concur in the result. Again, though, this court perhaps has failed to observe California Rules of Court, rule 29(a), which advises that "hearing in the Supreme Court after decision by a Court of Appeal will be ordered ... where it appears necessary to secure uni-

---

[5]The ALO also sought to minimize the undisputed justification on the ground the employer did not terminate Silva the second time immediately but permitted him to finish the day. Permission to finish the day may not demonstrate, however, that the employer was not relying on the misconduct or did not consider it serious.

formity of decision or the settlement of important questions of law ...." (Cf. my conc. opn. in *People* v. *Szeto* (1981) 29 Cal.3d 20 [171 Cal.Rptr. 652, 623 P.2d 213].) Hearing in this case was not necessary to secure "uniformity of decision" or to settle "important questions of law"; and questions such as those raised here regarding the persuasiveness and substantiality of the evidence do not, I think, require this court's attention.

Further, I believe that we should also have been guided in this ALRA matter by the following comment concerning NLRA matters that was approved 30 years ago by all 9 United States Supreme Court justices in *Universal Camera Corp.* v. *Labor Bd.* (1951) 340 U.S. 474, 491 [95 L.Ed. 456, 469, 71 S.Ct. 456]: "Whether on the record as a whole there is substantial evidence to support agency findings is a question which Congress *has placed in the keeping of the Courts of Appeals.* This Court will intervene only in what ought to be the rare instance when [during the appellate court proceeding] the standard appears to have been misapprehended or grossly misapplied." (Italics added. Cf. my conc. opn. in *People* v. *Superior Court* (*Wells*) (1980) 27 Cal.3d 670, 674-675 [165 Cal.Rptr. 872, 612 P.2d 962].)

Finally, by no means am I persuaded that "[a]n administrative board must accept as true the intended meaning of uncontradicted evidence." (See maj. opn., *ante*, p. 728; cf. 2 Davis, Administrative Law Treatise (1958) § 14.13, p. 324 *re* "whether a supposedly expert tribunal may use its own judgment in the face of uncontradicted expert testimony to the contrary"; 3 Davis, Administrative Law Treatise (2d ed. 1980) § 14.28, p. 126: "Findings may be based on an agency's expertise, without supporting evidence, and ... may be especially important to the judicial review process when the court does not share the agency's expertise"; and compare the pertinent opinions cited by the majority here (*LeVesque* v. *Workmen's Comp. App. Bd.* (1970) 1 Cal.3d 627 at p. 639 [83 Cal.Rptr. 208, 463 P.2d 432], and *McAllister* v. *Workmen's Comp. App. Bd.* (1968) 69 Cal.2d 408 at p. 413 [71 Cal.Rptr. 697, 445 P.2d 313]) with *Wilhelm* v. *Workmen's Comp. App. Bd.* (1967) 255 Cal.App.2d 30, 33 [62 Cal.Rptr. 829]: "[T]he board may disbelieve the testimony of any witness ....")

The petition of real party in interest United Farm Workers of America for a rehearing was denied August 26, 1981. Bird, C. J., did not participate therein.