[Civ. No. 7045. Fifth Dist. Aug. 16, 1983.]

NASH-DeCAMP COMPANY, Petitioner, v.
AGRICULTURAL LABOR RELATIONS BOARD, Respondent;
UNITED FARM WORKERS OF AMERICA, AFL-CIO,
Real Party in Interest.

COUNSEL

Littler, Mendelson, Fastiff & Tichy, Michael J. Hogan and Spencer H. Hipp for Petitioner.

Manuel M. Medeiros, Daniel G. Stone and Ismael Castro for Respondent.

Daniel A. Garcia for Real Party in Interest.

OPINION

**WOOLPERT, J.**—This court must decide whether pursuit of an alleged recent underpayment in the checks of an employee and his wife constitute protected "concerted activity" for the purpose of mutual aid or protection as defined in Labor Code section 1152 and protected under Labor Code section 1153, subdivision (a). After having extensively researched case authority in this area under the California Agricultural Labor Relations Act, the National Labor Relations Act and the federal circuits, we hold that under the particular facts of this case, such action is not concerted activity.

### THE PROCEEDINGS

Nash-DeCamp Company (hereafter the Company or Nash) was in the business of producing table and juice grapes at the Nash-DeCamp Vineyards in Tulare County in 1980.[1] Michael Anderson was the ranch manager charged with overall responsibility for the operation; Ricardo Bautista was one of two foremen and employed several crews totalling 30-40 workers in the fall harvest.

The United Farm Workers (UFW) had petitioned for and won a certification election at the vineyard on September 25. Objections were filed and

---

[1]All date references hereafter are to the year 1980 unless otherwise indicated.

the election results had not been certified at the time the sole charge brought here for review arose (Oct. 29) or was taken to hearing (Feb. 1981).

Nine charges were filed with the Agricultural Labor Relations Board (Board or ALRB). A consolidated administrative law hearing was heard in February 1981. During the course of the hearing before the administrative law officer (ALO) the parties reached a written settlement agreement on six of the nine charges, and those charges were dismissed. Of the remaining three charges, only the instant charge was later found to be supported by a preponderance of the evidence.

The ALO concluded that Javier Alvarado (Alvarado) was terminated by Anderson on October 29 for engaging in concerted activity protected by Labor Code section 1152, in violation of Labor Code section 1153, subdivisions (a) and (c), i.e., for pressing a pay dispute with Bautista on his and his wife's behalf.[2] The ALO recommended Alvarado be reinstated and made whole for any economic losses suffered as a result of his unlawful discharge.

The rulings, findings and conclusions of the ALO on the Alvarado charge were affirmed by the ALRB in decision 8 A.L.R.B. No. 5, issued January 25, 1982.

Pursuant to section 1160.8, a petition for writ of review was filed in this court by Nash on February 23, 1982. The only briefs filed were by the Company and Board.[3]

*Summary of Argument*

In its original briefs, Nash raised two issues challenging the ALO/Board findings and conclusions regarding Alvarado's termination on October 29.

---

[2]All statutory references hereafter are to the Labor Code.

Section 1152, part of the Agricultural Labor Relations Act (ALRA) of 1975, provides in pertinent part: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and *to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection* . . . ." (Italics added.)

Section 1153 states in part: "It shall be an unfair labor practice for an agricultural employer to do any of the following:

"(a) *To interfere with, restrain, or coerce agricultural employees in the exercise of the rights guaranteed in Section 1152.*

". . . . . . . . . . . . . . . . . . . . . . . . . .

"(c) By discrimination in regard to the hiring or tenure of employment, or any term or condition of employment, *to encourage or discourage membership in any labor organization.*" (Italics added.)

[3]The real party in interest herein—the UFW—formally intervened below but its representative waived the right to be present and did not attend the Alvarado hearing. No brief was filed by the UFW following the filing of the petition for writ of review in this court.

First, Nash alleged there was no substantial evidence on the whole of the record to support the finding Nash violated section 1153, subdivisions (a) and (c)[4] by discharging Alvarado on October 29 for engaging in protected concerted activity. Finally, Nash contended Alvarado quit his job on October 28 and was not discharged.

This court ordered supplemental briefing on the application of "concerted activity" to the facts. A writ of review then issued. Counsel for UFW participated in oral argument, disagreeing with Company's contention that Alvarado was not engaged in concerted activity.

### Introduction to Analysis

The ALO, and therefore the Board, concluded that "[t]here is little dispute about the facts . . . ." Because we agree to the lack of dispute, but find it necessary to more fully state the facts on certain points than the ALO, we preface our factual statements with the following appellate guidelines.

Section 1148 provides that "[t]he board shall follow applicable precedents of the National Labor Relations Act, as amended." Our Supreme Court has found it useful to begin its analysis of comparable statutory provisions with a review of the governing federal precedents. (*Vista Verde Farms* v. *Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 307, 318 [172 Cal.Rptr. 720, 625 P.2d 263].) We will be doing so. ■ First, however, this standard of review applies: "Findings of the board with respect to questions of fact are conclusive if supported by substantial evidence on the record considered as a whole. (Lab. Code, § 1160.8; *Tex-Cal Land Management, Inc.* v. *Agricultural Labor Relations Bd.* (1979) 24 Cal.3d 335, 343-346 [156 Cal.Rptr. 1, 595 P.2d 579].) While the administrative agency under this test is empowered to resolve conflicts in the evidence and to make its own credibility determination, 'the test of substantiality must be measured on the basis of the entire record, rather than by simply isolating evidence which supports the board and ignoring other relevant facts of record which rebut or explain that evidence.' [Citations.]" (*Martori Brothers Distributors* v. *Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 721, 727-728 [175 Cal.Rptr. 626, 631 P.2d 60].)

The comparable federal standard has been viewed in these terms: "[C]ourts must now assume more responsibility for the reasonableness and

---

[4]The Board concedes a finding pursuant to section 1153, subdivision (c), is not supported by the evidence in light of the fact the ALO specifically found there was no persuasive evidence Alvarado was discharged because of his union support.

fairness of Labor Board decisions than some courts have shown in the past. Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function. . . . The Board's findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both." (*Universal Camera Corp.* v. *Labor Bd.* (1951) 340 U.S. 474, 490 [95 L.Ed. 456, 468-469, 71 S.Ct. 456].)

The *Universal Camera Corp.* rule has been characterized as follows: "This 'limited' scope of review does not, however, require us to abdicate our responsibility to the extent of merely 'rubberstamping' our affirmance of the Board's decision when, after full review of the record, including the evidence opposed to the Board's views, we are unable conscientiously to conclude that the evidence supporting such decision is substantial. . . ." (*N. L. R. B.* v. *O. A. Fuller Super Markets, Inc.* (5th Cir. 1967) 374 F.2d 197, 200.)

For another version of the rule as applied in a concerted activity case: "It is incumbent on general counsel of the Board to prove unlawful conduct and unlawful purpose is not lightly to be inferred. National Labor Relations Board v. Federal Pacific Electric Company, 441 F.2d 765 (5th Cir. 1971). And while ascribing proper weight to credibility determinations of the Trial Examiner and the Board, it is the duty of this court to review the record as a whole to determine whether there exists substantial evidence to support the Board. Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Mere suspicions of unlawful motivation are not sufficient to constitute substantial evidence. Lozano Enterprises v. National Labor Relations Board, 357 F.2d 500 (9th Cir. 1966). Substantial evidence is more than a mere scintilla. It means such evidence as a reasonable mind might accept as adequate to support a conclusion. Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126 (1938)." (*N. L. R. B.* v. *Meinholdt Manufacturing, Inc.* (10th Cir. 1971) 451 F.2d 737, 738; see also *Royal Packing Co.* v. *Agricultural Labor Relations Bd.* (1980) 101 Cal.App.3d 826, 835-837 [161 Cal.Rptr. 870].)

*The "Undisputed" Facts*

*Union Activity*

Alvarado began working for the Company in December 1977. During the fall of 1980, Alvarado and his wife were members of one of approximately

ten harvest crews under the supervision of Foreman Bautista. Harvest crews worked in units of three to five people: one person packed grapes at a table or trailer while the others picked. In late September, Alvarado's harvest crew numbered four: Alvarado, his sister, Martha Ruiz, and Juan Gomez were the pickers and Alvarado's wife, Elsie, was the packer.

Bautista was aware Alvarado and his parents, Aurelio and Anna Maria, also Company employees, were involved in the union organization at Nash. Bautista was aware of the two organizational meetings held in September at the elder Alvarado's house, which Javier Alvarado attended.

At the hearing, Bautista portrayed himself as disinterested in the election outcome; his supervisor, Anderson, candidly admitted both he and Bautista opposed the union. In her recommended decision the ALO made this finding: "Alvarado's union support was not particularly noteworthy, no overt reprisals were made against more prominent supporters, and no action was taken against him until a month after the election." Therefore we limit our factual recitals to those pertinent to the Board decision.

### The Pay Dispute

Near the end of September, Alvarado and Bautista engaged in a pay dispute. At the beginning of one workday, Alvarado approached Bautista, who was sitting in his car, and told him he thought both his and his wife's paychecks were short $2 for each of the last two weeks ($8 total underpayment). Alvarado thought he could prove there had been an underpayment. Bautista questioned why he had waited two weeks to report the alleged shortages; Alvarado responded he thought the errors would have been rectified in the following checks; when they were not he promptly reported the problem. According to Alvarado, Bautista told him he would not pay the alleged shortages from the first week because he had waited too long to report them. When Alvarado continued to push the issue, Bautista told him to go back to work and talk to him at lunchtime.

When Alvarado returned to his row, his wife asked what Bautista had said. Alvarado related the foreman had refused to pay the shortages from the first week because he had not given prompt notice. Alvarado stated "that was the reason why [Bautista] was getting rich, what he stole from us." Bautista was standing near the edge of the row and overheard the remark. Bautista maintained at the hearing other employees heard the remark as well.

Bautista angrily stated he was "no crook." He took a $20 bill from his wallet and threw it at Alvarado. Alvarado told him he was sure of his

records and that he would wait for Bautista to check his books. Also Alvarado did not have change for a $20 bill. Bautista asked one of the other crew members for change and then paid Alvarado the $8. Bautista maintained when he later checked his books he found no underpayment had been made but never requested the $8 be returned. He was not asked on direct or cross-examination whether he represented to Alvarado that the pair would not be paid for the first week's shortage.

Shortly after the pay incident, on approximately September 28, Alvarado's pregnant wife left the crew. She was replaced by Socorro Romero and Socorro's husband, El Guero, bringing the crew number to five. This reduced the shares of each member of the crew.[5] Socorro and Alvarado occasionally engaged in arguments about the quality of each other's work.

### Leaving Work Early

During the 1980 harvest Alvarado had left work early on a few occasions, e.g., to take his wife to her doctor. According to Alvarado, he had told Bautista's checker/stamper/assistant, Sergio Arellano, on two such occasions prior to his discharge that he was leaving early and to relay the message to Bautista. Arellano confirmed this had occurred once. Arellano relayed the message to Bautista who said it was all right. On another occasion Alvarado told Mario Saldivar, who occupied a position similar to Arellano's, that he was leaving early. The message was relayed to Bautista. On all of these occasions when the departures occurred, Bautista was *not* present. Alvarado testified, and Bautista confirmed, that on other occasions either he or his wife told Bautista *personally* that they were leaving early. According to Bautista he was not concerned with the reason why employees were leaving early; his only concern was that he be informed.

### October 28

Alvarado did not work in the harvest on Monday, October 27. On Tuesday, October 28, he decided to leave early because he was suffering from a head cold. At approximately 12:30 p.m., Alvarado informed the checker, Arellano, that he would be leaving at 1 p.m. because he was not feeling well and asked Arellano to inform Bautista. Bautista was only four car lengths away at the time. The only member of the crew Alvarado informed was his sister. Alvarado saw Bautista in the fields during the next half hour,

---

[5]Employees were paid $4 per hour plus a fractional share of a bonus of 28 cents per box paid for each box packed by a crew. The fractional share decreased as the number of workers in a particular crew increased.

but did not tell him that he was leaving. Alvarado wasn't asked why he avoided Bautista, but admitted "I hardly talk to him." When Alvarado drove away he passed so close to Bautista that Bautista claimed: "I move because he's going to hit me." Arellano then relayed the message to Bautista who became "angry" and inquired why Alvarado had not informed him personally. Bautista angrily said: "That's what [I] am there for."

Socorro testified Alvarado said nothing to her about being ill that date and that he did not appear to be ill when he left.

Anderson testified Bautista came to him after lunch the same day and said to him "Javier [Alvarado] had packed his wheelbarrow up and left the field, and that he didn't say anything to him, and that he was mad and left."[6]

### October 29

The next morning Anderson and Alvarado spoke, using a union interpreter, Carolina Felipe.[7] According to Anderson, Alvarado "asked if he could come back to work"[8] and Anderson told him "no, that he had quit and walked off the job and not notified anybody." When Alvarado protested he had informed the checker, Arellano, Anderson stated the checker had no authority to give permission to anyone to leave. He added that since Bautista had been present, he could have told Bautista.

On cross-examination, Anderson acknowledged he had never warned Alvarado that if he left work without talking to the foreman he would be fired. Alvarado had testified Bautista never told him he would be fired if he left work early unless told directly.

Under questioning by the ALO, Anderson stated Bautista had not requested Alvarado be fired; the decision that Alvarado could not return was Anderson's.

### ALO's Findings and Conclusions

The ALO concluded Alvarado had not quit. Alvarado had given others messages for Bautista on prior occasions and had never been told he had to

---

[6]Inexplicably the general counsel never chose to cross-examine Bautista on the Alvarado discharge and Bautista was never asked what he told Anderson. No doubt if counsel for UFW had been present the ALO, Board and this court would have less temptation to speculate about hidden motives.

[7]Carolina Felipe testified, but not about this event.

[8]General counsel never cross-examined Anderson regarding this statement.

inform Bautista directly. Inasmuch as Bautista had the authority to approve early departures on his own without telling Anderson, the ALO found it reasonable to infer Bautista knew his report would provoke Alvarado's discharge or other disciplinary action.

In trying to determine Bautista's motive for making the report, the ALO rejected antiunion animus. The ALO concluded the "only persuasive explanation for Bautista's action" rested in the wage confrontation over a month earlier. Bautista had admitted anger over the disparaging comment about lining his pockets at the workers' expense. However, the ALO concluded Alvarado's complaint and discussion with his wife were protected concerted activity: he was acting on his wife's economic behalf as well as his own and his comment was directly related to that activity. The ALO concluded "Since concerted activity protected by section 1152 provoked Bautista's report to Anderson and Alvarado's subsequent discharge, the termination violates sections 1153, subdivision (a) and 1153, subdivision (c)." As previously noted, the Board concedes there was insufficient evidence to support the section 1153, subdivision (c) finding.

## DISCUSSION

### ANTIUNION ANIMUS NOT NECESSARY TO ESTABLISH SECTION 1153, SUBDIVISION (a) VIOLATION.

In this case it was found that the employer violated section 1153, subdivision (a), which prohibits interference with or restraint of agricultural employees in their right to engage in concerted activities for the purpose of mutual aid or protection.

A section 1153, subdivision (a) violation, unlike a subdivision (c) violation under the same statute, does not require any showing of antiunion animus, unlawful motive or discouragement of union activities by the employer.

It has been stated that Congress clearly intended to protect not only concerted activity under sanction of a labor union, but also concerted activity of the same nature engaged in by unorganized employees under the parallel provision of the National Labor Relations Act (NLRA): chapter 7, 29 United States Code section 157. (*Vic Tanny Intern., Inc.* v. *N. L. R. B.* (6th Cir. 1980) 622 F.2d 237, 241.) The employee concerted protest may be completely spontaneous and without union support if classifiable as "concerted activities for . . . mutual aid or protection." (§ 1152; *M. B. Zaninovich, Inc.* v. *Agricultural Labor Relations Bd.* (1981) 114 Cal.App.3d

665, 675, 679 [171 Cal.Rptr. 55]; *Nagata Brothers Farms* (1979) 5 A.L.R.B. No. 39, p. 2; cf. Gorman, Basic Text on Labor Law (1976) pp. 132-134, 297-302, 337; see also cases cited in Morris, The Developing Labor Law (1971) p. 65, fn. 5 and pp. 123-124, fn. 52.)

## THE DUAL MOTIVE SOLUTION

■ Simply because the employee has participated in union or other protected activities does not insulate the employee from discharge for misconduct or provide immunity from routine employment decisions. In the absence of union or other protected activities it is not the purpose of labor legislation to vest in the administrative board any control over an employer's business policies. (*Martori Brothers Distributors* v. *Agricultural Labor Relations Bd.*, *supra*, 29 Cal.3d 721, 728-729.)

■ Perhaps shocking to current thoughts of fairness, it has long been said that the employer may discharge an employee at will and without cause *unless* protected by labor legislation. This right of the employer has been summarized by the authors in 48 American Jurisprudence Second, Labor and Labor Relations, section 920, page 749: "Section 158(a)(3) of 29 USCS, which makes it an unfair labor practice for an employer, by discrimination in regard to hire or tenure of employment, to encourage or discourage membership in any labor organization, leaves the matter of employee discipline and discharge solely within the employer's discretion, as long as the employer does not discipline or discharge employees for engaging in protected activities. Indeed, as long as an employer does not discharge an employee for engaging in protected activities, he may fire him for any reason, just or not, reasonable or not, or for no cause or reason at all. In such a case, it is immaterial if the NLRB finds on sufficient evidence that the employee was a competent worker and that there was nothing in his performance to give dissatisfaction, because the NLRB cannot substitute its judgment for the employer's as to the reasonableness of a discharge." (Fns. omitted.)

It is apparent the typical dispute reaching the Board and appellate courts involves assertions of more than one reason for the employee's discharge. The employer claims a business reason even though no reason is required; the employee points to union or other concerted activity. This mix requires an analysis in which the trier of fact searches for the prevailing motive. Our Supreme Court has rejected two tests which courts had used to cut the Gordian knot of motivation. It passed over the approach which permitted reinstatement so long as there was *some* contributing union bias even though other legitimate grounds for discharge were present. The second, unaccept-

able test—"dominant motive"—focused on a determination of which of the motives was the principal moving force behind the discharge.

■ The third line of cases—the "but for" analysis—was adopted as the correct legal standard. In *Martori Brothers Distributors* v. *Agricultural Labor Relations Bd.*, *supra*, 29 Cal.3d 721, 729, the applicable rule is stated as follows: "When it appears that an employee was dismissed because of combined valid business reasons as well as for invalid reasons, such as union or other protected activities, the question becomes whether the discharge would not have occurred 'but for' the protected activity. (*Royal Packing Co.* v. *Agricultural Labor Relations Bd.*, *supra*, 101 Cal.App.3d 826, 834-835; *Sunnyside Nurseries, Inc.* v. *Agricultural Labor Relations Bd.*, *supra*, 93 Cal.App.3d 922, 935 et seq. [156 Cal.Rptr. 152].)"

In *Martori* there was evidence that the employee had been insubordinate, made threats and engaged in outrageous and disruptive conduct which the Board rejected as a mere pretext for the discharge in favor of the conclusion that the true reason was union activity. Because the Board may have been unaware of the correct legal standard the case was returned for reconsideration. (*Id.*, at p. 731.)

## THE CONCERTED ACTIVITY ISSUE

■ Concerted activity is protected if it meets four conditions: (1) there must be a work-related complaint or grievance; (2) a specific remedy or result must be sought through such activity; (3) the concerted activity must further some group interest; and (4) the activity should not be unlawful or otherwise improper (e.g., violent, in breach of contract or indefensibly disloyal). (*Shelly & Anderson Furniture Mfg. Co., Inc.* v. *N. L. R. B.* (9th Cir. 1974) 497 F.2d 1200, 1202-1203; *Labor Bd.* v. *Washington Aluminum Co.* (1962) 370 U.S. 9, 17 [8 L.Ed.2d 298, 304, 82 S.Ct. 1099]; Gorman, *op. cit. supra*, at pp. 296-297.)

The ALO herein concluded: "[R]egardless of the merits, Alvarado's complaint and his discussion with his wife are protected concerted activity: he was acting on his wife's behalf as well as his own, and his disparaging comment was directly related to that activity."

There was substantial evidence supporting conditions (1) and (2). Because condition (3) is the single real issue we do not determine whether the "stealing" accusation was protected under condition (4). Obviously, the ALO thought the comment had much to do with Bautista's latent animosity toward Alvarado. We proceed to the third condition and the novel question whether

Alvarado's back pay complaint on behalf of himself and his wife constituted "concerted activity" of the protected kind.

BACKGROUND

The term "concerted activities" was in use long before the enactment of the NLRA. Section 2 of the Norris-LaGuardia Act, 47 Statutes at Large 70 (1932), sought to halt interference with the right to unionize by protecting the worker "in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ." Because Congress was concerned with major organized activity, and not particularly with the definition of "concerted activities" and "other mutual aid or protection" as the terms might be applied in individual or small-group situations, it has been acknowledged that courts have had difficulty in dealing with these terms in the context of personal activity that appears self-motivated. (*Ontario Knife Co.* v. *N. L. R. B.* (2d Cir. 1980) 637 F.2d 840, 843.) This history has prompted some courts to conclude that in this limited situation "courts should adhere rather closely to the statutory text." (*Ibid.*, fn. omitted.) However, federal courts have been unable to reach consistent solutions by a mere reading of the statutory language.

For various reasons it did not take long for courts to apply "concerted" to individual action. It was accomplished by a shift of focus to the ends rather than the means of the activity. Emphasis was placed on the words "mutual aid or protection." For example, in *NLRB* v. *Weingarten, Inc.* (1975) 420 U.S. 251 [43 L.Ed.2d 171, 95 S.Ct. 959], protection was afforded an individual who requested a union representative to be present during an employer's investigatory interview which might result in disciplinary action.

Looking to the purpose of an individual worker's activity, in *N. L. R. B.* v. *Interboro Contractors, Inc.* (2d Cir. 1967) 388 F.2d 495, the court found constructive concerted activity when the individual's effort was deemed to be taken in support of the provisions of a collective bargaining agreement. The case has been followed, distinguished and rejected in the various circuits.

In *Alleluia Cushion Co., Inc.* (1975) 221 N.L.R.B. 999, the Board extended the *Interboro* rule to a situation in which there was no union activity or collective bargaining agreement in existence. The Board held that when a nonunion employee speaks up and seeks to enforce statutory provisions relating to occupational safety regulations designed for the benefit of all employees, in the absence of any evidence that fellow employees disavowed

such representation the Board would find an implied consent thereto and deem such activity to be concerted.

The National Labor Relations Board has applied such reasoning in numerous cases. (*Bighorn Beverage* (1978) 236 N.L.R.B. 736, 752-753; *Dawson Cabinet Company* (1977) 228 N.L.R.B. 290, 292; *Diagnostic Center Hospital Corp.* (1977) 228 N.L.R.B. 1215, 1217; *Self Cycle & Marine Distributor Co.* (1978) 237 N.L.R.B. 75, 76.)

The *Alleluia Cushion* decision was not reviewed by a court of appeal and several circuits have refused to follow such an extension of *Interboro* to nonunion and noncollective bargaining situations. (*N. L. R. B.* v. *Bighorn Beverage* (9th Cir. 1980) 614 F.2d 1238, 1242 [filing safety complaint]; *N. L. R. B.* v. *Dawson Cabinet Co., Inc.* (8th Cir. 1977) 566 F.2d 1079, 1082-1084 [violation of equal pay act]; *N. L. R. B.* v. *C & I Air Conditioning, Inc.* (9th Cir. 1973) 486 F.2d 977, 978-979 [complaint covering safety on job site]; *Krispy Kreme Doughnut Corp.* v. *N. L. R. B.* (4th Cir. 1980) 635 F.2d 304, 306-310 [sole employee discharged for refusing to forego a workers' compensation claim].)

In the past the Ninth Circuit has given limited approval to *Interboro* but not to *Alleluia Cushion*. In *N. L. R. B.* v. *C & I Air Conditioning, Inc., supra*, 486 F.2d 977, 978, the court recognized the "emergence of [the *Interboro*] rule" but found it unnecessary to follow. In *N. L. R. B.* v. *Bighorn Beverage, supra,* 614 F.2d 1238, 1242, the court rejected *Alleluia Cushion,* relied upon by the Board below, and refused to extend *Interboro* to situations where no collective bargaining agreement was in existence. And in *N. L. R. B.* v. *Adams Delivery Serv., Inc.* (9th Cir. 1980) 623 F.2d 96, 100, a single employee was not paid for overtime hours. The employee kept requesting overtime despite the company's response it did not pay overtime and was eventually fired. The court acknowledged *Interboro* had been adopted "in principle" in the Ninth Circuit but found *Interboro* inapplicable because there was actual union participation in this case. Most recently, however, the Ninth Circuit squarely rejected *Interboro* in *Royal Development Co., Ltd.* v. *N. L. R. B.* (9th Cir. 1983) 703 F.2d 363, 374, wherein the court found the *Interboro* doctrine "to be inconsistent with the express language of the [National Labor Relations] Act." (*Ibid.*)

### SIMILAR CASES

Decisions involving one, two or three employees cannot be explained by mere attention to numbers. If Congress sought to make two rather than one employee the criteria, its intent could have been expressed in more direct

language. Even though some cases appear to be resolved against the employee because only one employee exerted the effort, and others suggest the mere fact of two rather than one will gain protection for the two employees, there is more consistency to be found in the case results if attention is paid to the words "for the purpose of . . . mutual aid or protection." " '[E]ven if the activities of an individual employee should never be protected, it hardly follows that it is the distinction between one and two employees which best effectuates the purposes of the [NLRA]. And it would scarcely follow at all if we assume a large industrial plant employing thousands of people.' Note, *The Requirement of 'Concerted' Action Under The NLRA,* 53 Colum. L.Rev. 514, 517 (1953)." (Comment, *Constructive Concerted Activity and Individual Rights: The Northern Metal—Interboro Split* (1972) 121 U. Pa. L.Rev. 152, 154-155, fn. 22 (hereafter cited as Comment).)

■ We proceed on the basis that Alvarado was acting only on behalf of himself and his wife. He and his wife were members of a crew which to an undetermined extent shared earnings. The precise nature of the claimed pay shortage was never developed in the testimony. Bautista indicated he reviewed the checker's records after the dispute and found no error. That no other member of the crew was interested in the shortage can be inferred from Alvarado's testimony which makes it appear Alvarado's "compadre" and fellow crew member, Gomez, made change so that the $8 could be paid. He did not join in the complaint. No other crew member asked for similar back pay.

In making the complaint Alvarado spoke of his pay, and only incidentally that of his wife. Later in the day he made a point of bringing the matter into the open again, saying: "I told [Bautista] that he was angry because I had complained regarding my money, and that he had sent me off to work, and prior to that, he would take others out to flip coins, or to play cards, and during work time." Because this is the concerted activity relied upon by the ALO and Board, we now refer to illustrative cases which bear on the issue whether this was concerted activity for the mutual benefit and protection of similarly situated workers, or a mere personal inquiry.

Where a sole employee leafletted and made telephone calls to fellow employees aimed at evaluating their union representation, the action was held to be concerted because the communications were an exhortation directed toward group activity on a matter of common concern—adequate union representation. (*N. L. R. B.* v. *Lummus Industries, Inc.* (11th Cir. 1982) 679 F.2d 229, 233-234.)

In *Indiana Gear Works* v. *N. L. R. B.* (7th Cir. 1967) 371 F.2d 273, 276, the discharge of an employee was upheld even though he had casual help

of two other employees in preparing and posting sarcastic cartoons ridiculing a two-cent an hour wage increase. Because there was no proof that the action was intended to induce or prepare for group action, the action was unprotected griping.

In another action two relatives, uncle and nephew, working for the same company, were criticized in front of fellow workers because they had gone to their union to complain about a wage shortage. The company president observed that he did not " 'need no middle man running back to the Hall, complaining about what was going on in this building.' " The union representative intervened and obtained the "small amount of six dollars about which they were concerned." (*N. L. R. B.* v. *B. J. Provenzale Company, Inc.* (6th Cir. 1975) 512 F.2d 599, 601.) Although the employer was "annoyed" by this activity, the subsequent discharge of the men was found to be simply a part of a necessary reduction of employees. Time had passed between the annoyance and discharge. (*Id.*, at p. 602.)

Reversing the decision of the National Labor Relations Board below, the Sixth Circuit held that an employee's complaints regarding her seniority status were not concerted activity. They were made "in her own behalf in a purely personal capacity and . . . while the complaints may have related to the status of [her] fellow janitor-cleaners, they [did] not amount to protected concerted activity." (*ARO, Inc.* v. *N. L. R. B.* (6th Cir. 1979) 596 F.2d 713, 718.)

An employee was protected when she inquired of management about the company's financial status. She said she was worried because there was no union. The court held that the welfare of other workers was involved. A distinction was drawn between complaints seeking to resolve only personal problems and those having the welfare of other workers in mind. (*Randolph Division, Ethan Allen, Inc.* v. *N. L. R. B.* (1st Cir. 1975) 513 F.2d 706, 708-709.) Similarly, an employee was protected who was seen speaking to several fellow employees about higher wages. "The requirement of concertedness relates to the end, not the means." (*N. L. R. B.* v. *Sencore, Inc.* (8th Cir. 1977) 558 F.2d 433, 434.)

In a Fourth Circuit case a male employee was discharged without protection of the labor law when he came to the assistance of his female cousin who complained of sexual harassment. She had made an informal complaint but said she " 'wasn't putting in a grievance.' " (*Blaw-Knox Foundry & Mill Mach.* v. *N. L. R. B.* (4th Cir. 1981) 646 F.2d 113, 114.) When her cousin heard about it he persuaded her to return to the office with him where a confrontation took place. He said, " 'just don't put your hands on her no

more . . . or you'll see, . . .'" (*Id.*, at p. 115.) Counsel for the Board maintained that this was "'classic concerted activity.'" (*Ibid.*) It was held unprotected because of a "purely personal concern" which did not amount to group activity. His actions revealed no "concern for the welfare of workers generally, but rather the personal object of his brief intervention." (*Id.*, at p. 116.) We suggest the fact that the fired worker did not follow through with any further action after the initial confrontation should have little bearing on the concertedness of his actions.

In *Scooba Mfg. Co.* v. *N. L. R. B.* (5th Cir. 1982) 694 F.2d 82, a mother lost her job when she protested her son's discharge. They both worked for the same company. In the course of her complaint she became very angry and proclaimed: "'It would be nice if it was a union here. A whole lot of things going on wouldn't be going on.'" (*Id.*, at p. 83.) The dispute then was directed to the employer's complaints about her own work. Her subsequent discharge was held within the employer's discretion because "[p]urely personal disputes are not within the protection of the Act. The General Counsel must show that some sort of collective worker action is contemplated." (*Id.*, at pp. 84-85.)

In *N. L. R. B.* v. *Northern Metal Company* (3d Cir. 1971) 440 F.2d 881, 884-888, an employee who pressed demands for holiday pay to which he deemed himself entitled under the collective bargaining agreement was held not to be engaged in concerted activity. The result urged by the National Labor Relations Board, i.e., that the action was concerted because it theoretically affected the rights of all employees in the unit, was rejected as fictional.

Finally, in *N. L. R. B.* v. *Buddies Supermarkets, Inc.* (5th Cir. 1973) 481 F.2d 714, 720, an employee attempted to have written into his contract a more favorable commission rate than the rate accepted by other employees. He had never been designated as a spokesman for the others, did not speak with the company on their behalf and it did not appear he was inviting others to join in his protest. It was deemed his actions were more properly termed individual griping or complaining rather than protected concerted activity because there was no element of collective action or contemplation thereof. The court acknowledged the employee's argument that if he had succeeded in having a more favorable commission rate written into his contract this success might have inured to the benefit of other employees, but termed it "an exceedingly tenuous basis upon which to rest a finding of concerted activity." (*Ibid.*)

## A HELPFUL ALRB ANALYSIS

While this case was pending before the ALRB another matter was being heard by the same ALO involving a similar finding of concerted activity: *B & B Farms* (1981) 7 A.L.R.B. No. 38. The worker who was discharged (Garcia), had a prior employment history which was not remarkable, except he had been late to work three times. He and another worker were tractor drivers on the same crew. The two men met privately and discussed their complaint that they did not have a set lunch period, but no course of action was determined. The next day Garcia took action which resulted in his discharge. He protested the lack of a specific lunch period, voicing his objections as an individual. Given the opportunity to continue work without a set lunch period, or quitting, he left work. This was held to be a firing. The ALO found this was constructive concerted activity.

The Board disagreed. It referred to *Interboro Contractors, Inc.* (1966) 157 N.L.R.B. 1295 (enforced 388 F.2d 495), *Alleluia Cushion Co., Inc., supra,* 221 N.L.R.B. 999, and to *Miranda Mushroom Farm, Inc.* (1980) 6 A.L.R.B. No. 22. It then noted that in *National Wax Company* (1980) 251 N.L.R.B. 1064, the NLRB rejected the concept of "collective rippling effect." In the discussion a distinction was made between an employee's protest about wages which could be resolved individually and a wage increase which would necessarily affect "all its employees." (*B & B Farms, supra,* 7 A.L.R.B. No. 38, p. 8.) It was concluded that Garcia's protest "did not foreclose the employer from reacting solely to the individual employees." (*Id.,* at p. 9.)

The Board appears to have been looking for something more substantial in the objective, saying "[h]ere the relationship which existed between Respondent and its tractor drivers was not akin to a bargaining agreement, and it cannot be said that Garcia was attempting to enforce anything like such an agreement." (*Ibid.*) The concurring opinion agreed with the conclusion that there was no protected activity, but noted a lack of proof of employer knowledge and a failure of the other panel members to give effect to adverse federal circuit court reactions to the constructive concerted activity doctrine. (*Id.,* at pp. 11-12 (conc. opn. of Member McCarthy).)

## CONCLUSION

We conclude that emphasis must be given to the objective of the person or persons engaged in the activity. Although the number of participants may

be significant, it may not be conclusive. If an issue can be solved individually without affecting the rights or obligations of others similarly situated, the action would tend to fall on the nonconcerted side. If there is a "purely personal" or "mere griping" character to the activity, it is unlikely there would be protection. As indicated by the cases summarized *ante,* whether the action of an individual employee has been accorded protection under the NLRA or ALRA has often turned on the court's interpretation of the *purpose* and *effect* of such action and not upon the more limited question of whether there was, in fact, action "in concert." (Comment, *supra,* at pp. 153-154.)

In this case the verbal exchange arose from a mere inquiry of a possible bookkeeping error, a matter unlikely to have real consequence even to the two persons concerned. Though others might have been equally involved, Alvarado and the listeners treated it as a mere personal inquiry. In fact, later in the day Alvarado spoke again in the singular and added his comment of hurt feelings because Bautista, the man he had accused of stealing a few hours before, would not include him in card playing at work. The mere addition of his wife to his pay complaint did not change the personal character of his effort. The activity which supposedly caused his discharge was not concerted.[9]

---

[9]In light of our conclusion that the wage dispute did not constitute concerted activity and was therefore not subject to protection under the act, it is unnecessary for us to reach a further issue which deeply troubles this court: causation.

The ALO and Board opinions fail to reflect record evidence by the three principals herein (Alvarado, Bautista and Anderson) that Bautista customarily reported to Anderson when an employee left the field early and had done so in the past when Alvarado left early. Further, it appears October 29 was the first occasion on which Alvarado chose to report his early departure to a checker when Bautista was actually present in the area. Bautista and later Anderson drew the conclusion this was improper.

After ruling out antiunion animus as a cause for the discharge, the ALO worked backward to try and discern why Bautista made the report to Anderson "that he knew . . . would provoke Alvarado's discharge or some other disciplinary action."

Bautista was never asked what he told Anderson. We have only Anderson's recollection that Bautista stated "[Alvarado] had packed his wheelbarrow up and left the field, and that he didn't say anything to him, and that he was mad and left." While Bautista apparently failed to mention Alvarado reported to a checker before departing, his remark in other respects is consistent with the testimony at the hearing. Alvarado did fail to report to Bautista when Bautista was close by; Bautista's displeasure at *this fact* is reflected in the statement to Anderson. The mere making of the report, under all of the circumstances, was not that notable. The ALO's conclusion that Bautista made the report because of the latent animosity between the two men due to the wage incident over a month earlier, in order to effect Alvarado's discharge, is not supported by the whole of the record testimony (principally the prior pattern of Bautista's reporting early departures to Anderson) and was founded on mere suspicion.

The order of the Agricultural Labor Relations Board is annulled.

Hanson (P. D.), Acting P. J., and Hamlin, J., concurred.