[No. H021585. Sixth Dist. Nov. 27, 2001.]

COASTAL BERRY COMPANY, Petitioner, v.
AGRICULTURAL LABOR RELATIONS BOARD, Respondent;

SERGIO LEAL et al., Real Parties in Interest.

2

**COUNSEL**

Lombardo & Gilles and James W. Sullivan for Petitioner.

J. Antonio Barbosa and Julie Demaris for Respondent.

No appearance for Real Parties in Interest.

**OPINION**

**ELIA, J.**—Hundreds of workers at Coastal Berry Company believed their employer was pressuring them to accept the United Farm Workers union (UFW). They reacted by engaging in a protest and work stoppage, after which Coastal Berry discharged or refused to rehire 12 of them, including the 7 real parties in interest. The Agricultural Labor Relations Board (ALRB or Board) found that these terminations constituted an unfair labor practice within the meaning of Labor Code section 1153, subdivision (a), of the Agricultural Labor Relations Act (ALRA or Act).[1]

Coastal Berry petitions for review, contending that the Board erred in directing it to reinstate real parties in interest and awarding them backpay, because the protesters had engaged in unprotected activity and serious strike misconduct, thereby justifying their termination. We find error in the Board's evaluation of the evidence and therefore set aside the order.

*Background*

Coastal Berry is a large strawberry producer with operations in different counties of California. When the company was acquired in 1997 by David

---

[1]Labor Code section 1153, subdivision (a), will hereafter be referred to as section 1153(a). All further references to California statutes will be to the Labor Code.

Gladstone, the UFW was conducting a campaign to organize Coastal Berry workers. The company had a neutrality agreement with the UFW which expired in October 1997, but Gladstone and the company president, David Smith, attempted to maintain a neutrality policy in order to reduce the potential for violence and maintain successful business operations. Nevertheless, the company favored unionization by the UFW until July 1998. Gladstone communicated to the workers his belief that unions offered certain advantages to both employer and employee, and he gave the UFW access to the workers to promote harmony between the company and the union. Nevertheless, the UFW alleged unfair discipline of UFW supporters by supervisors, and it made several demands that Gladstone and Smith found unreasonable, such as the hiring or firing of certain people. Despite the support the company gave to the UFW organizers, tension between the company and them increased during 1998.

At the same time, many of the workers opposed the intervention of the UFW. On June 3, 1998, 300 to 400 of them engaged in a six-hour demonstration at the main shop on Beach Street in Watsonville to protest the company's perceived pressure on workers to support the union. In a petition they asked Smith to maintain neutrality and to negotiate with the workers without the intrusion of the UFW. Smith assured the workers that the company would not negotiate with the UFW unless it won an election. Nevertheless, he pointed out that "there were people who supported the union and he had to respect their rights also." Gladstone urged the workers to sign the election card so they could resolve the conflict as soon as possible.

On June 30, 1998, Smith and Gladstone met with eight of the antiunion workers, including Sergio Leal and Jose Guadalupe Fernandez. The workers accused Smith and Gladstone of running the company for the benefit of the UFW, and they wanted Gladstone to sell the company to the employees. According to Gladstone, the workers also demanded removal of the UFW from the fields. Gladstone again urged them to sign the cards, but Leal refused.

On July 1, 1998, the antiunion workers conducted another demonstration and work stoppage at the Beach Street shop. Between 200 and 500 people participated. Smith tried to close the back gate to the administrative compound, but it was blocked by protesters' vehicles, including those of charging parties Paulino Vega and Hilarion Silva. Eventually Smith was able to pull the gate partially shut, but at least 100 of the protesters were still able to get inside.

Meanwhile, at the Silliman Ranch, Sheriff's Deputies Robin Mitchell and Christine Swannack, who were dispatched to a "possible pending fight," saw increasing numbers of employees arriving, "waving their arms, almost like in a rally type mood." Some were holding boards. Mitchell warned the group that the demonstration must remain peaceful, but Jose Guadalupe Fernandez explained that they had been unsuccessful using peaceful means and they had "no other options" at that point. Mitchell walked around a building to see more than 100 protesters in the fields, where between 20 and 40 employees were working. Some of the protesters threw crates containing packed strawberries, destroying the work that had been done. Small fights broke out as groups of four or five protesters attacked individual workers.

In the fields anti-UFW demonstrators took empty strawberry boxes, "presumably" to prevent other employees from working. Isabel Rendon, a UFW supporter who was trying to work, took a stack of boxes into her furrow and sat on them. Jose Guadalupe Fernandez told another protester, Jose Flores, to "take charge of that." Flores yanked the boxes out from under Rendon, causing her to fall down. In another area Efrem Vargas was surrounded by one group and shoved by Jorge Perez. Ramon and Ruben Gallegos were hit or kicked by Jorge Perez and others. Yolanda Lobato threw a box of packed strawberries at Sandra Rocha, a UFW supporter, hitting Rocha in the face.

When she saw the employees fighting, Mitchell called for emergency backup and dispersed the crowd. She then followed them back to the parking lot, where Smith and another company officer, Earl Pirtle, were seated in a manager's truck. Officers from various agencies in both Monterey and Santa Cruz counties arrived to help control what appeared to be a "lynch mob forming." About 50 protesters surrounded the truck, rocked it from side to side, and placed objects in its path. Mitchell saw one man deflating the tires. Several threw stacks of empty strawberry cartons at the truck, and a few, including Jose Guadalupe Fernandez, threw heavy wooden pallets. Fernandez placed an irrigation pipe in front of the truck. Fearful for the safety of the occupants of the truck as well as the deputy sheriffs and police officers, Mitchell and two other deputies went to stop Fernandez. He was about to grab another pallet or stack of cartons when the officers arrested him. As they led Fernandez to the patrol car, the protesters threw rocks at them. One rock shattered the windshield of the car; others struck retreating officers. Parts of the scene at the ranch were captured on a videotape, which was shown at the hearing before the administrative law judge.

The next day, about 200 antiunion employees gathered at the Silliman Ranch to talk to Smith. Smith was concerned about the quality of the crop;

he warned the workers that if the berries were not picked, the company would have to disk the fields and there would be no work available. Elisa Jimenez, speaking for the group, communicated the protesters' demands to Smith. Smith rejected their requests to be paid for the previous day, as well as their renewed demands that the company be sold to the employees and that the UFW supporters be removed from the fields. Smith did agree, however, not to discipline the people who had demonstrated the day before. At that time he believed that the majority of them had engaged in protected activity, and he wanted to get people back to work and avoid a costly and destructive prosecution and disciplinary process.

On July 23, 1998, an election was finally held, resulting in a victory for the "Comite," the organization of anti-UFW employees. UFW supporters protested the election, which was eventually overturned.

Despite Smith's assurances of July 2, 1998, a company investigation led to the dismissals of 12 of the July 1 protesters, 11 of whom were the charging parties in this proceeding. The stated reasons for the terminations included destroying packed strawberries, assaulting employees who were trying to work, blocking the gate at the Beach Street facility (Vega and Silva), and throwing stacks of cartons (Mariano Andrade). The two apparent leaders of the antiunion faction were also terminated—Jose Guadalupe Fernandez because of his arrest and obstruction of Smith's exit and Sergio Leal for threatening to destroy Coastal Berry and helping prevent other employees from working.

The matter came before an administrative law judge (ALJ) in September 1999. After hearing testimony from numerous witnesses and reviewing the videotaped coverage of the July 1 protest, the ALJ concluded that "absent serious misconduct, the protest was protected under the Act." While some of the protesters' demands had been unreasonable, the "dominant themes" of the July 1 protest were protected. In any event, Coastal Berry had "condoned all of the protest[e]rs' conduct by virtue of the July 2 agreement, and by subsequently discharging and/or refusing to rehire the Charging Parties, violated section 1353(a) [sic] of the Act." With respect to individual protesters, the ALJ found insufficient evidence of serious misconduct except by Jorge Perez, whose assaults on three employees were "flagrant and egregious."

After reviewing the evidence presented to the ALJ, the ALRB reached a different conclusion. The Board first determined that the protesters had engaged in concerted activity "designed to challenge the Company's alleged

support of the UFW and to prevent certain employees from working." While at the Beach Street compound the workers were protected by the Act "[i]nsofar as they engaged in a peaceful work stoppage and demonstration" there. Protesters lost the protection of the ALRA, however, "when they thereafter proceeded to the Silliman Ranch to prevent employees perceived to be sympathetic to the UFW from working, by their choice of means—threats, intimidation, and even force . . . . By seeking to, and actually interfering with, the rights of supposed UFW supporters to 'refrain from joining' in their activities, the demonstrators engaged in unprotected activities." Consequently, the Board concluded, "[t]o the extent the conduct was not protected, Respondent would have been privileged to discharge any Charging Parties but for the agreement to forgive such conduct. The pivotal question, therefore, is whether, under the facts of this case, the Board is obligated to honor the condonation agreement."

The Board rejected the ALJ's condonation rationale because the July 2 agreement violated public policy by excusing unlawful conduct. The Board then turned to the question of whether any of the charging parties had engaged in serious misconduct that warranted denial of reinstatement. It agreed with the ALJ that most of the individual charging parties were entitled to reinstatement, but found that Yolanda Lobato and Hilda Zuniga, in addition to Jorge Perez, had engaged in serious strike misconduct.[2]

## *Discussion*

■ Section 1152 enumerates the rights of agricultural employees, including the right to join or refrain from labor organizations and to engage in "concerted activities" for mutual aid or protection. Section 1153(a) declares it an unfair labor practice to "interfere with, restrain, or coerce agricultural employees in the exercise of the rights guaranteed in Section 1152."

"Concerted activity is protected if it meets four conditions: (1) there must be a work-related complaint or grievance; (2) a specific remedy or result must be sought through such activity; (3) the concerted activity must further some group interest; and (4) the activity should not be unlawful or otherwise improper (e.g., violent, in breach of contract or indefensibly disloyal). [Citing federal cases.]." (*Nash-DeCamp Co. v. Agricultural Labor Relations Bd.* (1983) 146 Cal.App.3d 92, 104 [193 Cal.Rptr. 910] (*Nash*); accord,

---

[2]The ALJ had characterized Lobato's action in throwing a box of strawberries at Sandra Rocha's face as "a momentary act of misconduct, causing no apparent physical injury," while Zuniga had at most "verbally abused" Rocha in the field. The Board, however, relied on the evidence that Zuniga had forced Rocha to retreat after trying to take away her punch tool, the device she used to credit workers each time they submitted a box of packed berries.

*Bertuccio v. Agricultural Labor Relations Bd.* (1988) 202 Cal.App.3d 1369, 1404 [249 Cal.Rptr. 473].)

As framed by the parties, the primary issue before us is twofold: (1) Was the demonstration of July 1, 1998 protected activity under the ALRA? and (2) Did any of the charging parties engage in strike misconduct so as to justify Coastal Berry's refusal to reinstate them? ■ Coastal Berry contends that real parties in interest were properly discharged because they entertained unlawful goals at both the Beach Street compound and the fields of Silliman Ranch. Coastal Berry further contends that real parties in interest engaged in "serious strike misconduct" that justified their termination and the denial of their reinstatement.

We accept the Board's factual determination that the demonstration at the Beach Street facility was a peaceful work stoppage expressing resistance to the employer's preference for the UFW. That the protesters also made unreasonable demands, such as the removal of UFW supporters from the fields, did not remove the entire protest from the protection of the ALRA. The Board also determined, however, that the protesters who "rushed the field" were outside the protection of the ALRA because they had interfered with the right of UFW supporters to refrain from joining in the work stoppage. The Board expressly stated that the crowd had entered the fields "for the declared purpose of preventing the UFW supporters from working." Additional protesters who followed "actually succeeded in preventing the harvesters from working by such means as threats, physical violence, or merely depriving them of the tools required to perform their tasks." Consequently, the Board stated, Coastal Berry "would have been privileged to discharge any Charging Parties but for the agreement to forgive such conduct."

The Board went on, however, to find the condonation agreement invalid. Having eliminated the condonation theory, the Board should have returned to its previous conclusion, that the conduct at the ranch was unprotected activity. In that light, the discharge "cannot be regarded as an illegal interference with the workers' rights under the labor statute." (*Bertuccio v. Agricultural Labor Relations Bd., supra,* 202 Cal.App.3d at p. 1404.) "In the absence of union or other protected activities it is not the purpose of labor legislation to vest in the administrative board any control over an employer's business policies." (*Nash, supra,* 146 Cal.App.3d at p. 103, citing *Martori Brothers Distributors v. Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 721, 728, 729 [175 Cal.Rptr. 626, 631 P.2d 60].) "Perhaps shocking to current thoughts of fairness, it has long been said that the employer may

discharge an employee at will and without cause *unless* protected by labor legislation." (*Nash, supra,* at p. 103.) That legislation, like its federal counterpart, " 'leaves the matter of employee discipline and discharge solely within the employer's discretion, as long as the employer does not discipline or discharge employees for engaging in protected activities. Indeed, as long as an employer does not discharge an employee for engaging in protected activities, he may fire him for any reason, just or not, reasonable or not, or for no cause or reason at all. . . .' " (*Ibid.*) Thus, if protesters who rushed the fields engaged in unprotected conduct by interfering with the workers there, it was unnecessary to proceed to determine whether their individual actions constituted "serious strike misconduct."[3]

In any event, the Board's analysis of the asserted misconduct of individual employees was faulty. Recognizing the mandate of section 1148, the Board purported to "follow applicable precedents of the National Labor Relations Act, as amended." However, the Board measured real parties in interest's conduct according to the standard described in *W.C. McQuaide, Inc.* (1975) 220 NLRB 593, 594 and *Coronet Casuals* (1973) 207 NLRB 304, 305. In both of those decisions the National Labor Relations Board (NLRB) discounted the effect of verbal abuse and threats and ruled that such language could not justify denial of reinstatement where it was not accompanied by violence or "any physical acts or gestures that would provide added emphasis or meaning to [the strikers'] words." (*W.C. McQuaide, Inc., supra,* 220 NLRB at p. 594; *Coronet Casuals, supra,* 207 NLRB 304, 305.)

The Board should not have applied this long-abandoned standard, however. In reviewing the NLRB's decision in *W.C. McQuaide,* the Third Circuit Court of Appeals took the opposite view of verbal abuse and threats. The court held that abusive verbal conduct need *not* be accompanied by physical acts to remove the employee from protection of the Act. (*N. L. R. B. v. W. C. McQuaide, Inc.* (3d Cir. 1977) 552 F.2d 519, 527-528.) The court instead adopted a test identical to that used in measuring union conduct—that is, " 'whether the misconduct is such that, under the circumstances existing, it may reasonably tend to coerce or intimidate employees in the exercise of rights protected under the Act.' " (*Id.* at p. 528.)

In *Clear Pine Mouldings, Inc.* (1984) 268 NLRB 1044, the NLRB itself adopted the standard employed by the Third Circuit, concluding that striking

---

[3]There was no independent finding that those employees were subjected to an unfair labor practice independent of the discharges and refusals to rehire. The Board proceeded from the issue of whether the protesters had engaged in protected activity to the question of whether strike misconduct precluded their reinstatement, with a stop along the way to consider condonation. The final order implies a violation solely of section 1153(a), presumably based on the terminations.

workers' conduct may justify denial of reinstatement if, " ' "under the circumstances existing, it may reasonably tend to coerce or intimidate employees in the exercise of rights protected under the [National Labor Relations] Act." ' " (*Clear Pine Mouldings, Inc., supra,* 268 NLRB at p. 1046, quoting *N. L. R. B. v. W. C. McQuaide, Inc., supra,* 552 F.2d at p. 528; see also *Mohawk Liquer Co.* (1990) 300 NLRB 1075 [*Clear Pine* standard is objective, requiring no actual coercive effect or intimidation].) The First, Fourth, Sixth, Seventh, Eighth, Tenth, and District of Columbia Circuits have also followed this test, holding that strike misconduct is "serious" (thereby justifying dismissal or denial of reinstatement) if "it reasonably tends to coerce or intimidate" nonstriking workers. (*Richmond Recording Corp. v. N.L.R.B.* (7th Cir. 1987) 836 F.2d 289, 295; *Associated Grocers of New England v. N. L. R. B.* (1st Cir. 1977) 562 F.2d 1333, 1336; *Newport News Shipbuilding & Dry Dock v. N.L.R.B.* (4th Cir. 1984) 738 F.2d 1404, 1408, fn. 6; *Teledyne Industries, Inc. v. N.L.R.B.* (6th Cir. 1990) 911 F.2d 1214, 1222; *NMC Finishing v. N.L.R.B.* (8th Cir. 1996) 101 F.3d 528, 531; *Medite of New Mexico, Inc. v. N.L.R.B.* (10th Cir.1995) 72 F.3d 780, 790; *General Indus. Emp. Union Local 42 v. N.L.R.B.* (D.C. Cir. 1991) 951 F.2d 1308, 1314.)[4]

 ██ Strike misconduct thus need not consist of physical acts, but may consist of any expression of hostility that may tend to coerce or intimidate nonstriking employees. The misconduct need not be directed at those employees to disqualify the striker from reinstatement; threatening customers and company officials and striking their vehicles have also been deemed misconduct even where no actual damage resulted.[5] (See, e.g., *PBA, Inc.* (1984) 270 NLRB 998 [throwing rocks at company officials and

---

[4]The procedural analysis in this context is settled. "[O]nce the General Counsel has initially established that a striker was denied reinstatement for conduct related to the strike, the burden of going forward with the evidence shifts to the employer to establish that it had an honest belief that the striker in question engaged in the strike misconduct. If the employer establishes that, then the burden of going forward shifts back to the General Counsel to establish that the striker in question did not in fact engage in the alleged misconduct" or it was not sufficiently serious to remove the protection of the Act. (*Siemens Energy & Automation, Inc.* (Aug. 10, 1999) 328 NLRB No. 164, p. 2; *General Chemical Corp.* (1988) 290 NLRB 76, 82; *Medite of New Mexico, Inc. v. N.L.R.B., supra,* 72 F.3d 780, 790.) Of course, " 'an employer's determination not to reinstate a striker must be based on evidence that the striker personally engaged in strike misconduct.' " (*Medite of New Mexico, Inc. v. N.L.R.B., supra,* 72 F.3d at p. 790, quoting *Midwest Solvents, Inc. v. N.L.R.B.* (10th Cir. 1982) 696 F.2d 763, 765.)

[5]Some authority suggests that nonstriking employees need not even be present for the act to constitute misconduct: "However, it is not clear from the cases whether misconduct against someone such as a manager or other nonemployee must occur in the presence of employees to be available as a basis for disqualification, whether employee presence is satisfied from the presence of the accused striker, or whether it is assumed that knowledge of the event will be disseminated among employees. Clearly a lone striker cannot escape discipline simply

nonstriking employees]; *New Galax Mirror Corp.* (1984) 273 NLRB 1232 [potential harm in throwing bottle rocket through front door of plant during manufacturing operations]; *General Chemical Corp., supra,* 290 NLRB 76, 82 [misconduct directed at attorney, supervisor, and independent contractor]; *GSM, Inc.* (1987) 284 NLRB 174, 175 [throwing beer can at employer's delivery truck]; *Hotel Holiday Inn de Isla Verde* (1982) 265 NLRB 1513 [hitting car of company president and throwing rocks toward hotel].) ▇ Actions that promote or encourage misconduct by other strikers may also justify discharge. (See *GSM, Inc., supra,* 284 NLRB at p. 175.)[6] And the Seventh Circuit has held that "[t]he Act does not protect striking employees who commit acts of vandalism or sabotage against their employer." (*N.L.R.B. v. Augusta Bakery Corp.* (7th Cir. 1992) 957 F.2d 1467, 1477.)

Thus, even to the extent that some of the protesters engaged in protected activity, the Board nonetheless applied incorrect standards to determine whether those employees had committed strike misconduct. Because the decision rests on "erroneous legal foundations," this matter should be returned to the Board for reconsideration of its decision. (*Vessey & Co. v. Agricultural Labor Relations Bd.* (1989) 210 Cal.App.3d 629, 643 [259 Cal.Rptr. 77]; cf. *Martori Brothers Distributors v. Agricultural Labor Relations Bd., supra,* 29 Cal.3d at p. 731; *J. R. Norton Co. v. Agricultural Labor Relations Bd.* (1979) 26 Cal.3d 1, 38-39 [160 Cal.Rptr. 710, 603 P.2d 1306].)[7]

As to some of the employees, the result will undoubtedly be the same. Silva and Vega, for example, did not engage in any conduct that could be construed as tending to coerce or intimidate, particularly in light of the finding—which is supported by substantial evidence—that they did not intend to block the closing of the gate. The Board may find, however, that those who threw stacks of cartons at the truck engaged in misconduct, as the

---

because no other employee observes him club a manager or firebomb the employer's plant (where a security camera captures the misconduct on videotape)." (*Virginia Manufacturing Co., Inc.* (1993) 310 NLRB 1261, 1272; see also *Clougherty Packing Company* (1989) 292 NLRB 1139 [throwing rock at unidentified car in presence of *other picketers* tended to inhibit them from returning to work].)

[6]This outcome may be relevant to the disposition of Hilda Zuniga's case as well as that of Jose Guadalupe Fernandez. Fernandez was found to have directed another protester to take the strawberry boxes away from Isabel Rendon. Zuniga was terminated for encouraging the attack on Sandra Rocha and urging her coworkers to take away Rocha's punch tool. The Board found that Zuniga herself "appeared determined to incapacitate Rocha's ability to record the crew members' output by wrestling away her punch tool."

[7]In light of this disposition, we decline to reach the issue regarding the denial of sanctions for discovery misconduct by the general counsel.

ALJ suggested.[8] We will not purport to make the Board's factual findings in the first instance, but only note the inappropriate factors on which the Board appears to have relied in some of its conclusions.

In undertaking its analysis the Board must not only adhere to the correct test of misconduct, but also avoid irrelevant considerations based on actions the employer did not take. The Board does not explain the meaning or significance of its finding, for example, that Coastal Berry "would not have" discharged Alvaro Guzman for destroying berries.[9] If it is demonstrated that (a) throwing packed strawberries constituted serious strike misconduct in these circumstances and (b) Guzman would have been denied reinstatement if Coastal Berry had known of this conduct at the time of the termination, the Board may consider it in its order. (Cf. *Martori Brothers Distributors v. Agricultural Labor Relations Bd.*, *supra*, 29 Cal.3d at p.730 [but-for test applied to mixed-motive situation].) The same reasoning would apply to Leal, who admitted throwing crates of berries in the air.

The Board dismissed the act of throwing crates or stacked cartons at the truck containing Smith and Pirtle because it was not mentioned in most of the termination letters. However, where strike misconduct is at issue, acts discovered after a discharge are nonetheless relevant to establishing entitlement to reinstatement and backpay. (See, e.g., *Axelson, Inc.* (1987) 285 NLRB 862; *East Island Swiss Products* (1976) 226 NLRB 1207, 1208; cf. *Mojave Electric Cooperative, Inc.* (1998) 327 NLRB 13, 19 [discovery of misconduct limits backpay to period between the date of the unlawful discharge to the date the new information was discovered and eliminates reinstatement as a remedy].)

The Board is also cautioned that disparate treatment (the rationale it used to justify reinstatement of Sergio Leal) is irrelevant to this case. Even if it were an issue, disparate treatment would not have been established by pointing out that other *protesters* threw berry crates that day but were not disciplined.

Finally, we observe that the Board did not address evidence material to the general counsel's showing. In the case of Jose Guadalupe Fernandez, for

[8]The ALJ recognized that throwing objects at vehicles may constitute serious strike misconduct. The judge suggested, therefore, that "it is not clearly established that throwing boxes at Smith's vehicle was not, in itself, grounds for discharge." Because he found condonation applicable, however, the ALJ declined to reach any "final conclusion" regarding Andrade, the one employee formally accused of throwing cartons at the truck.

[9]The Board also appears to have placed the burden on Coastal Berry to prove that Guzman actually threw berry crates, rather than requiring the General Counsel to prove that he did not.

example, the Board failed to mention Deputy Sheriff Mitchell's testimony, credited by the ALJ, which identified Fernandez as "one of the few" who were throwing wooden pallets and empty strawberry crates at the truck, hitting the truck and some of the law enforcement officers. Upon remand, the Board will have the opportunity to apply the *Clear Pine* test to any of the real parties who threw objects while in the course of otherwise protected activity.

## Disposition

Let a decree issue setting aside the ALRB's order and remanding the cause for reconsideration under the appropriate standards and principles governing discharge of employees exercising their rights under section 1152. Coastal Berry shall recover its costs.

Premo, Acting P. J., and Mihara, J., concurred.